# Commonwealth *v.* C. A. Spillman, C. W. Hays and C. A. Coggins, Appellants.

*Criminal law—Conspiracy to cheat and defraud trust company— Kiting checks.*

·A conviction of the crime of conspiracy to cheat and defraud a trust company will be sustained, if there is sufficient evidence to show that there was present a common design between the defendants to divert the funds of a trust company improperly to their benefit or the benefit of any one of them, or to secure profits to themselves or any of them by devious and unlawful methods, to the injury of the trust company. Nor is it necessary that the unity of purpose or design requisite to secure a conviction of the conspiracy should be manifested by an equal sharing of the spoils among the conspirators, or a use of the funds thus obtained in the same enterprise. If the actions of the conspirators showed a common design that one of their number should specially profit as a result of their illegal operations, there was present sufficient unity of purpose or design to secure a conviction in a prosecution for conspiracy to cheat and defraud a trust company.

In the trial of an indictment for conspiracy to cheat and defraud, the case was for the jury and the verdict of guilty will be sustained, where it appeared from the Commonwealth's evidence that two of the defendants had purchased a controlling interest in the trust company with funds obtained from the third defendant by kiting his checks; ·that thereafter the said two defendants were elected directors and officers of the trust company and that they continued the system of kiting the third defendant's checks in ever increasing amounts and also discounted notes for the third defendant without proper security, and that such transactions finally resulted in the failure of the trust company.

*Appeals—Assignments of error—Statement of question involved.*

Matters raised in the assignments of error should be referred to in the statement of the questions involved, and failure to do so is reason for diregarding the assignment.

*Charge of the court—Reasonable doubt—Sufficiency.*

If the trial judge fails to charge as fully upon some point as counsel regard as proper, the judge's attention should be called to it before the jury leave the box, in order that he may correct any omission. If counsel fails to make such request, the court will not

be held to be in error for failure to elaborate on such matter in his charge.

Argued December 5, 1919.  Appeal, Nos. 12, 13 and 14, April T., 1920, by defendants, from judgment of Q. S. Allegheny County, February sessions, 1917, No. 264, on verdict of guilty in the cases of Commonwealth v. C. A. Spillman, C. W. Hays and C. A. Coggins.  Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ.  Affirmed.

Indictment for conspiracy to cheat and defraud trust company.  Before HAYMAKER, J.

The facts are stated in the opinion of the Superior Court.

Verdict of guilty on which judgment of sentence was passed.  Defendants appealed.

*Errors assigned* were various rulings on evidence, answers to points, and charge of the court.

*Frederic W. Miller,* for appellant.

*R. M. Gibson,* Assistant District Attorney, and with him *Harry H. Rowand,* District Attorney, for appellee.

OPINION BY KELLER, J., February 28, 1920:

The defendants, Spillman, Hays and Coggins, were jointly indicted, tried, and convicted on the charge of conspiracy to cheat and defraud the Central Trust Company of Pittsburgh.  Separate appeals were properly taken, but as precisely the same questions are raised on all the appeals and they were argued together, we will dispose of them in one opinion.

The defendants offered no evidence at the trial, but at the conclusion of the Commonwealth's case, moved for binding instructions on the ground that the evidence was insufficient to go to the jury.  The same position was

taken in this court, the questions involved being stated by counsel for the appellants as follows: (1) Did the Commonwealth produce sufficient evidence to justify a conviction of all three defendants of conspiracy to cheat and defraud the Central Trust Company? (2) Did the Commonwealth produce sufficient evidence to justify the conviction of any two of the defendants of conspiracy to cheat and defraud the Central Trust Company? Our task, therefore, is to review the testimony introduced on behalf of the Commonwealth for the purpose of determining whether there was competent and substantial evidence in the case from which the jury might fairly find that the defendants or any two of them were guilty of the offense charged.

On January 1, 1915, the defendants, Spillman and Hays, secured control of the First National Bank of Aspinwall, an institution with a capital of $25,000, deposits of $141,550, and assets of $195,000. The defendant, Coggins, either was or became a depositor and large borrower at said bank, as well as at the Monongahela National Bank of Pittsburgh; his deposits and loans being carried not only in his own name, but in the name of his wife, Laura V. Coggins, and of M. O. Coggins Company, under which name he carried on the produce business.

About the middle of May, 1915, Spillman and Hays began to negotiate for the purchase of the Central Trust Company, with the result that they made an agreement with those in control of said trust company for the purchase of a majority of its shares at $70 per share, and agreed to buy all the stock that was offered prior to the next annual meeting in January, 1916, at the same price. They stated that responsible business men were associated with them in the purchase and that they had the money to pay cash for all the shares. The capital stock of the Central Trust Company was $150,000, divided into 3,000 shares of $50 par value; the surplus was $50,000, and the undivided profits $22,000. On June 1, 1915, they

paid $35,000 for 500 shares, assumed control of the trust company, and replaced eight of the ten members of the board of directors with themselves and six men of their own choosing; Spillman was elected president, and Hays vice-president. Of the 500 shares, 198 were issued to Spillman, 242 to Hays, and 60 (ten each) to the other six directors named by them. The $35,000 used to purchase these 500 shares were obtained in this manner. Coggins, who had a deposit in the Monongahela National Bank in the M. O. Coggins Company account of $9,426, drew a check on that account to the order of Hays for $35,000, which was deposited in the First National Bank of Aspinwall, to the credit of Hays, and a treasurer's check immediately drawn in favor of Hays for that sum, and this check was used to pay for the first 500 shares purchased. The kite thus begun was carried on until July 12, 1916, and in connection with loans made to Coggins, Spillman and Hays, and enterprises in which they were interested, caused the failure of the trust company. As first begun, the kiting was between the First National Bank of Aspinwall and the Monongahela National Bank, but immediately after Spillman and Hays secured control of the Central Trust Company, it was extended so as to take in the trust company, and so carried on until the national bank examiner, after an examination of the affairs of the First National Bank of Aspinwall on June 15, 1915, objected to its continuance, and after June 18, 1915, was conducted between the Monongahela National Bank and the trust company, and required the active aid and assistance of Spillman and Hays in its operation. The kite as conducted by Coggins between these two institutions, was as follows: A check would be drawn against one of Coggins's accounts or that of one of his employees, in the bank, for an amount in excess of the balance then to the credit of the account; this would be deposited to M. O. Coggins Company's credit in the trust company, and a portion used in and about his business, but checks for the entire sum or more would immediately

be drawn against it and deposited to the Coggins account in the bank, before the original check on the bank was returned for payment by the trust company, and the transaction was repeated daily for ever increasing sums. In this way, Coggins obtained a fictitious credit, without the payment of interest, for the amount of the kite, which at the close of the operation was over $45,000. This device was probably resorted to for the reason that Coggins's borrowing capacity at both the Monongahela National Bank and the Aspinwall Bank was exhausted, his loans at the former bank being about $60,000. Two days after Spillman and Hays secured control of the Central Trust Company, they discounted for Coggins three of his notes for $5,000 each at the trust company, though previous to that time he had no account there, and six days later a note for $25,000 signed by Coggins's wife and endorsed by M. O. Coggins Company and C. A. Coggins, was discounted, over the protest of the treasurer of the company, out of the proceeds of which the three notes were lifted. In reply to the treasurer's protest that the Coggins paper was not good, and that they were not strong financially, Spillman said "he didn't want any more suggestions about the paper." On June 16, 1915, the State bank examiner protested to Spillman and Hays against the trust company carrying the $25,000 Coggins note, but notwithstanding this protest, it was increased on October 21, 1915, to $40,000, with no security except a second mortgage on lands in Colorado, and, in addition, C. A. Coggins's own note for $5,000, without other endorsement, was purchased. Both these notes were unpaid when the trust company failed and resulted in heavy loss to the institution. In the meantime, using the 500 shares of Central Trust Company stock purchased with the $35,000 obtained through the Coggins kiting operation, as collateral, Spillman and Hays obtained loans at other banks, with the proceeds of which they paid for other stock of the Central Trust Company, and repeated the operation with the stock thus purchased, and by June 15, 1915, they

had obtained 1,682 out of the 3,000 shares of the Central Trust Company, and they then refused to take any more stock offered to them under the agreement before referred to. Shortly after Spillman and Hays obtained control of the trust company and were elected president and vice-president, respectively, their salaries were increased from nothing to $4,500 each. Within a few days after June 1, 1915, a loan of $15,000 was made to Hays, on his note endorsed by Spillman, and later a loan was given to Hays's father, a member of the board of directors whose qualifying stock had been paid for out of the $35,000 kite, of $5,000, and loans to other directors named by him whose stock had been similarly paid for, of $6,000; notes of Spillman endorsed by Hays and others aggregating $5,000, and of corporations and firms in which he or Hays were interested, to the amount of $36,000, were discounted, on all of which the trust company suffered an almost total loss. To secure the money required for these loans, good notes with listed collateral were called. When the treasurer and assistant treasurer protested against the mounting responsibility attaching to the ever increasing Coggins kite, they were told by Spillman and Hays, to extend Coggins any credit he wished. To further the Coggins kiting transaction, his checks on the Monongahela National Bank were held back and delayed in presentation, and his accounts in the trust company were conducted in a different manner from all other accounts, receiving special consideration, and finally when the Monongahela National Bank for its protection insisted on having certified or cashier's checks deposited by Coggins before it would give him checking credit for his uncollected deposits, Spillman and Hays ordered the treasurer of the Central Trust Company to issue treasurer's checks against uncollected deposits consisting of Coggins's own checks on the Monongahela National Bank, and continued so to do until the crash came by the Monongahela National Bank returning unpaid, for want of sufficient funds, over $45,000 of Coggins's checks; and

these the trust company carried on its books as cash until a receiver was appointed of its affairs, and the checks were found to be worthless. This issuing of treasurer's checks in furtherance of the Coggins kite was begun long after the State banking commissioner had time and again called the attention of Spillman and Hays to this kite and demanded that it be discontinued.

The learned counsel for the appellant in his very able and interesting argument in this court, laid stress on the fact that no loss was suffered from the Coggins kiting operation until July 12, 1916, or two days after Spillman resigned from the trust company as president and director. As long as the trust company supplied the means or credit required for the ever increasing float, of course, no loss would be discovered from the operation, but the liability of the trust company was approximately as great the week before Spillman's resignation as it was on the day the checks were returned, and the loss was potentially incurred when the kite was started with the knowledge and consent of Spillman and Hays, and persisted in despite the protests of the State banking commissioner. Nor was it necessary that the unity of purpose or design requisite to secure a conviction of conspiracy should be manifested by an equal sharing of the spoils among the conspirators or a use of the funds thus obtained in the same enterprise. If the actions of the conspirators showed a common design that one of their number should specially profit as a result of their illegal operations, there was present sufficient unity of purpose or design to secure a conviction. Nor was it essential that it should have been the purpose of the conspirators to wreck the trust company when they embarked on their common enterprise; it was sufficient if there was present a common design to divert the funds of the trust company improperly to their benefit or the benefit of any of them, or to secure profits to themselves or any of them by devious and unlawful methods to the injury of the trust company: Com. v. Cotter, 55 Pa. Superior Ct. 554,

pp. 557, 558. From the review of the evidence above
given (and there was more bearing on the subject), which
we have gone into at this length because of the earnest-
ness of counsel for appellant in his argument, we are
satisfied that there was sufficient evidence introduced on
the trial, if believed by the jury, to justify a conviction of
all three defendants of conspiracy to cheat and defraud
the Central Trust Company.

The assignments of error complaining of the admis-
sion of certain evidence on the trial might well be disre-
garded as they are not referred to in the statement of
questions involved: Rule XXIII; Henning v. Keiper, 37
Pa. Superior Ct. 488; Bousquet's Est., 206 Pa. 534; and
as to the fourth specification, no exception was taken to
the ruling of the court below. We have, however, care-
fully considered them all and are not satisfied that the
evidence thus admitted was not relevant as throwing
some light on the whole transaction and evidencing to
some extent the guilty knowledge and intention of the de-
fendants in connection therewith. Nor are we able to see
any force in the contention of the appellant's counsel
that the charge of the court was inadequate, misleading
and unfair to the defendants. On the contrary, it appears
to us to have been full and fair, and a careful and ade-
quate presentation of the issue being tried and the law
applicable thereto. Special emphasis was laid by the trial
judge on the fact that the burden was on the Common-
wealth to satisfy the jury beyond a reasonable doubt of
the guilt of the defendants; that they could not be con-
victed for lack of knowledge of scientific banking, for
errors of judgment, nor for mere negligence in the oper-
ation or management of the institution, but only if they
were satisfied beyond a reasonable doubt that they or any
two of them had conspired, i. e., had formed a common de-
sign or purpose to cheat and defraud the institution. A
full and correct explanation of what was meant by rea-
sonable doubt was also given and if the counsel for the
defendants wished any further and more explicit instruc-

tions to the jury as to the presumption of the defendants' innocence, it was his duty to have made such specific request of the court: Com. v. Holgate, 63 Pa. Superior Ct. 246, pp. 256, 257. In our opinion, the matter was sufficiently gone into in the charge of the court and the answers to the defendants' points.

The assignments of error are all overruled and the judgment is affirmed, and it is ordered that the appellants severally appear in the court below at such time as they may be called and be by the court committed until they have complied with their respective sentences.