Commonwealth *v.* Cohen et al., Appellants.

36

38

Argued September 9, 1963.   Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Abraham J. Brem Levy,* for appellant.

*John Rogers Carroll,* with him *John Patrick Walsh,* for appellant.

*Jay D. Barsky,* for appellant.

*Ray E. Machen,* with him *Bernard L. Lemisch,* for appellant.

*Morton Witkin,* with him *Witkin & Egan,* for appellant.

*Arlen Specter,* Assistant District Attorney, with him *Gordon Gelfond* and *Louis F. McCabe,* Assistant District Attorneys, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY ERVIN, J., March 19, 1964:

The six defendants, Raymond Cohen, John Joseph Elco, Joseph E. Hartsough, Edward F. Walker, Abraham D. Berman and Ben Lapensohn, have appealed from the judgment and sentence of the court below following a joint trial on a single bill of indictment charging them with conspiracy to cheat and defraud a union of its money, goods and property.

The district attorney, with allowance of the court below, presented a bill to the grand jury which, on September 18, 1959, was returned as a true bill. On September 25, 1961 the defendants filed a motion to quash the indictment on the ground that they had not been afforded a preliminary hearing before the presentation of the bill to the grand jury. The motion was denied by Judges SLOANE, GLEESON and McCLANAGHAN. After a trial which lasted ten weeks and one day, the jury returned verdicts of guilty as to all defendants on June 3, 1963. A review of the record will reveal that the Commonwealth produced 98 witnesses and introduced 1116 exhibits. None of the defendants testified. No evidence was introduced on behalf of any of the defendants. After the dismissal of motions for new trial and in arrest of judgment and the imposition of sentences, these appeals were taken.

Several of the appellants argued that the court below erred in not quashing the indictment because of the absence of a preliminary hearing. It should be pointed out that this question was not presented or argued in the post-trial motions filed in the court below. We will, however, consider this argument on the merits.

Upon review of an order to quash an indictment based on a special bill submitted under the supervision of the court, we will not set aside the action of the court below except for an abuse of discretion both manifest and flagrant, and in a clear case where we

are convinced that harm has been done to the defendant by improper conduct that interfered with his substantial rights: *Com. v. Carey*, 201 Pa. Superior Ct. 292, 296, 191 A. 2d 730; *Rowand v. Com.*, 82 Pa.. 405, 408; *Com. v. Ramsey*, 42 Pa. Superior Ct. 25, 32.

In *Com. v. Cody*, 191 Pa. Superior Ct. 354, 358, 156 A. 2d 620, we said: "Adherence to this practice [obtaining prior leave of court for a district attorney's bill of indictment] will obviate attacks on indictments returned without a preliminary hearing and previous binding over."

The evidence at the hearing on appellants' petition for a writ of habeas corpus[1] in the court of common pleas, established that the district attorney was confronted with an emergency which required utilizing the district attorney's bill of indictment. The district attorney's office had received certain leads from the United States Senate Committee investigating Local 107 in 1958 but Local 107 instituted an action in the United States District Court for the District of Columbia to prevent the Senate from turning over the original Local 107 records to the Philadelphia district attorney's office. Appeals were taken to the Court of Appeals for the District of Columbia and then a petition for a writ of certiorari was filed with the United States Supreme Court. It was not until January of 1959 that the original records were turned over to the district attorney. William V. Suckle, the assistant district attorney then in charge of the case, organized the evidence and prepared a report, which was a time

---

[1] Petitions for writs of habeas corpus were filed on behalf of the defendants challenging the indictment because of the absence of a preliminary hearing. After hearings, the petitions were dismissed by the court below. Appeals were taken to the Superior Court but were discontinued after the decision in *Com. ex rel. Nichols v. Lederer*, 193 Pa. Superior Ct. 482, 165 A. 2d 711, affirmed per curiam 404 Pa. 218, 172 A. 2d 319.

consuming procedure because of the obvious complexity of the case involving a review of 15,000 checks and much legal research. The report was delayed for a short period of time due to Mr. Suckle's illness. On July 24, 1959 the report, consisting of more than 200 pages, was turned over to the district attorney, who studied it in the time available while he was performing his numerous other duties. After an initial staff meeting on August 20, 1959, a subsequent staff meeting was held on August 25, 1959, at which time the district attorney decided that the evidence was sufficient to proceed with the prosecution of the defendants. The district attorney decided to petition to have a special grand jury to convene in order to seek additional evidence which might extend the statute of limitations or, failing that, to have the special grand jury make an interim presentment to the regular grand jury. After the Court of Quarter Sessions granted the petition for a special grand jury, a petition was filed on behalf of the defendants to secure a writ of prohibition, which was ultimately successful when the Supreme Court of Pennsylvania prohibited further action by the special grand jury: *Special Grand Jury Case,* 397 Pa. 254 (1959), 154 A. 2d 592.

When the petition for a writ of prohibition threatened to obstruct the proceedings of the special grand jury, the district attorney was faced with the necessity of an alternative procedure with time rapidly running out. Concerned that a preliminary hearing would take at least ten days, the district attorney ordered the preparation of a petition for a district attorney's bill of indictment on September 10, 1959, which petition was completed on September 15, 1959. On September 16, 1959 the petition was presented to Judge CARROLL, who approved it, and on September 17 and 18 evidence was heard by the grand jury with the bill of indictment being returned on September 18, 1959.

Among the findings of fact in the opinion of Judge GOLD when this question was considered, are: "Despite the protestations of relators to the contrary, we find no evidence of undue delay or negligence on the part of the District Attorney covering the period ending July 24, 1959. . . . first, we perceive no evidence pointing resolutely to the conclusion that relators were deliberately or purposefully deprived of their right to a preliminary hearing; second, a genuine emergency existed which called for the special remedy of a district attorney's bill; and third, the public good and interest made such a step justifiable. . . . no harm has been done to the relators by the District Attorney's alleged improper conduct." The court below, in its opinion, further stated: "Local 107 is a gigantic union with more than 12,000 members situate in the greater Philadelphia area. Its immense economic influence in the transportation and allied industries is well known. We have been and are now of the belief that Local 107 is a strong, powerful, self-disciplined and militant labor organization, which, concentrated in the field of transportation, is affected with a public interest no less than the utilities, railroads and trucking industry which it serves." The court below noted that the principal reason for a preliminary hearing was to prevent a defendant from being detained for a crime he never committed. See the exhaustive opinion of Judge WOODSIDE for this Court in *Com. v. O'Brien,* 181 Pa. Superior Ct. 382, 387, 124 A. 2d 666. The court below also pointed out that the defendants were not deprived of their liberty since bail was posted an hour or so after they surrendered themselves. It also stated: "There is not a word in their [defendants'] voluminous briefs citing any harm, prejudice, or any adverse strategic position caused to them by the failure of the District Attorney to grant them a preliminary hearing. Nor was there any testimony or evidence to this effect."

The value of a preliminary hearing in acquainting a defendant with the nature of the charge and the evidence to be presented against him is uniquely absent in this case because the great bulk of the evidence, checks and vouchers, was prepared and controlled by the defendants themselves. The district attorney was confronted with an emergency. The statute of limitations was about to expire. A matter of great public importance was involved. While the crime of conspiracy is only a misdemeanor when it is applied to a situation such as was presented in this case, it is affected with a great public interest. To prevent the treasury of an important union, with its 12,000 members, from being looted was a matter of great public interest. Unions today have assumed a very important position in the economic life of our country. Millions of working people are directly affected by the conduct of such unions. It is just as important to see that the affairs of a union are conducted in an honest manner as it is to see that the affairs of a municipality are so conducted. This case, in our opinion, falls within one or more of the well recognized exceptions set forth by Judge CLARK in a charge to a grand jury in 1845, which has frequently been referred to by the courts. The exceptions are as follows: "The first of these is, 'where criminal courts, of their own motion, call the attention of grand juries to, and direct the investigation of, matters of general public import, which, from their nature and operation in the entire community, justify such intervention.' This power of the court, it is said, will only be thus exercised, however, in the investigation of general and public evils, such as great riots, general public nuisances, and flagrant vices; it will not be applied in cases of ordinary crime.

"The second exception is, 'where the attorney-general, ex officio, prefers an indictment before a grand jury, without a previous binding over or commitment

of the accused.' This power is properly exercised where there is occasion for great haste in applying the machinery of the law, or where the exigencies of the case and the public interests may reasonably require such action to be taken. The procedure in such cases, however, is under the supervision of the court, and if the process and power is misapplied the court will vindicate itself in restraining its exercise." *Com. v. Green,* 126 Pa. 531, 537, 17 A. 878.

The appellants argue that the delay was caused by the district attorney's own inactivity. We do not believe that the record substantiates this argument. Even if we did agree, we are convinced that the district attorney acted in good faith with no resultant harm to the appellants and that his action was in the public interest. The record reveals that the appellants also were responsible for much of the delay which prevented the institution of these criminal proceedings. While the facts show that the district attorney acted properly in this case, if it were otherwise certainly the rights of the people should not be deemed waived for his dereliction by having these important convictions invalidated on such a technicality.

### The Acquisition of Control of the Union

No brief was filed on behalf of appellant, John J. Elco. The other five appellants argued that the evidence was not sufficient to sustain a conviction. In this connection we review the evidence and inferences reasonably deducible therefrom in the light most favorable to the Commonwealth: *Com. v. Burns,* 409 Pa. 619, 187 A. 2d 552. It is our duty to accept as true all of the Commonwealth's evidence upon which, if believed, the jury could have properly based its verdict: *Com. v. Gooslin,* 410 Pa. 285, 287, 189 A. 2d 157. So considered, the evidence establishes that the defend-

ants entered into a continuing conspiracy to cheat and defraud Local 107; that in the execution of their scheme they planned to and did gain control of the union and its treasury; that they extended their domination by replacing key officials and then proceeded to loot the union treasury by various devices.

The rules for evaluating the evidence in a conspiracy trial are well set forth by President Judge RHODES in the case of *Com. v. Evans*, 190 Pa. Superior Ct. 179, 202, 154 A. 2d 57, as follows: "In a conspiracy trial, where fraud is involved, there is a wide latitude allowed in the introduction of evidence. Consideration should be given to the background of the arrangements made by defendants and their methods of association; where a criminal scheme has numerous actors and shifting scenes of action the conspiracy is often made out by the association of detached facts and by the reasonable inferences deducible therefrom. Evidence of the acts and circumstances in fulfillment of the object of the conspiracy is relevant."

In the case of *Com. v. Burdell*, 380 Pa. 43, 49, 110 A. 2d 193, Chief Justice HORACE STERN said: "It is hornbook law that a conspirator is criminally responsible for the acts of his co-conspirators which are committed in furtherance of the common design even though he was not present when the acts were committed: . . . ."

Chief Justice GIBSON, in *Rogers v. Hall*, 4 Watts 359, 361, stated: "Now the least degree of concert or collusion between parties to an illegal transaction makes the act of one the act of all. . . ."

With these principles in mind, let us now consider the evidence. It shows that in November 1953 a general election was held by the union with Joseph Grace, president, presiding. He refused to recognize any nominations other than that of Cohen. The November election was set aside by the International Brother-

hood of Teamsters but in a subsequent election held in May 1954, Cohen was elected secretary-treasurer and assumed office on June 4, 1954. Shortly after Cohen was elected to office, Joseph Hartsough was employed as a bookkeeper and Ben Lapensohn was hired to do assorted jobs in late June or early July of 1954. The other defendants, Walker, Berman and Elco, also supported Cohen and were recipients of union moneys which were used to pay off Cohen's election supporters. On June 10, 1954, Cohen and Grace signed a check for $15,000.00 payable to the order of "Cash," which was endorsed by Hartsough. Five days later a second check in the amount of $10,000.00, also payable to the order of "Cash" and endorsed by Hartsough, was used, together with the first check, to pay off Cohen's election supporters. These funds were distributed by Cohen, Berman and Walker. The defendants Berman, Walker and Elco each received part of the $25,000.00. Walker got $180.00; Elco received $225.00 and Berman was paid $600.00.

The funds of the union were also used to pay $8,500.00 to one Samuel Kirsch as a repayment of election expenses. Samuel Kirsch was an employe of a closely held corporation which Lapensohn controlled.

A check of the union in the amount of $4,573.43 was used to repay Local 169 of the Teamsters Union for advances and election expenses paid by Local 169 for Cohen. Local 169 advanced Cohen $3,000.00, consisting of a check for $2,000.00 and two checks for $500.00 each. Cohen arranged for these loans with the president of Local 169, who was Edward Hartsough, brother of the defendant, Joseph E. Hartsough. In addition, Local 169 paid to Majestic Press and Keystone Printing Company the sum of $1,573.43 for Cohen's campaign literature. After Cohen gained control of the union's treasury, the above mentioned check

of $4,573.43 was used by Local 107 to repay Local **169.** The check of Local 107 for $4,573.43 covered the advance to Cohen in the amount of $3,000.00 and the amount paid to the printing company for the campaign literature of $1,573.43. The use of the union's money to pay for Cohen's election expenses was illegal. The officers of a union occupy a fiduciary relationship and may not use union moneys for their own private purposes. Union moneys may only be used for legitimate expenses of the union.

After Cohen became secretary-treasurer of the union, he and the other defendants proceeded to centralize their control by violence and the threat of violence and the use of the union's money to pay off and oust all opponents. Business agent Kelleher resigned in order to "get rid of the harassment that my wife and family was going through." Business agent John Fisher's resignation was accomplished by paying him $5,000.00 out of the union treasury, which, after deductions, led Cohen and Grace to write him a check for $4,112.50. Both violence and union money were used to persuade business agent and corresponding secretary Raymond Kelly to be dismissed. Kelly testified that he "didn't want any physical violence to happen to" him.

Figures were altered on many of the checks. **Harry** Graff received $100.00 but the second figure was altered by an additional loop to $180.00. Patrick Flanagan received $100.00 and by the insertion of a proper mark the $100.00 was changed to $400.00. Sam Doman, Sr. was supposed to have received $225.00 but he received at most $175.00. Frank Charlton and Thomas Charlton each signed his name on the voucher with no sum of money written in. They received $100.00 each but $150.00 was written beside their names on the voucher.

The Horn & Hardart Organizational Operation

Local 107 attempted to unionize Horn & Hardart and approximately 60 checks amounting to $92,385.10 were written on the union treasury. Each check was purportedly supported by a voucher explaining the expenditures. Twelve witnesses testified that they received substantially less than the amounts specified on the vouchers. All of these checks were made payable to "Cash," signed by Cohen and Grace and endorsed by Joseph Hartsough. A bank officer testified that it was their custom to require the person receiving the cash on a check drawn to the order of "Cash," to endorse the check. Elco was in charge of this operation. He rented the office headquarters, ordered the telephone service in his name and signed vouchers for a number of men and on a number of occasions the recipient did not get as much money as he had signed for.

### The Gallagher Strike

In January and February of 1957 the union struck E. A. Gallagher Company. Eight checks totaling $41,710.00 were written to the order of "Cash," signed by Cohen and Grace and all but one were endorsed by Hartsough. Some 13 witnesses testified that they received less money than was stated on the vouchers signed by them in blank.

### Missing and Unexplained Checks to Ben Lapensohn

In addition to Lapensohn's regular pay checks, a series of 13 checks were written to his order without any voucher in the union records to explain their issuance. Stubs contained the notations, "Services Ren-

dered," "Personal Services," "Returned Expenses" and "Extra Expenses." These checks were all for sums in excess of $800.00. Ten of these checks were missing. An examination of the union check book showed that the cancelled checks had been scotch taped in and then ripped out of the check books.

### Clothing Purchases

Checks were written on the union bank account covering various clothing purchases at Diamond & Company for Cohen and Walker. A series of purchases for Cohen totaled $1,333.99, ranging from suits in the amount of $135.00 to ties up to $10.00. Union checks for a total of $1,200.00 were issued in payment of Cohen's personal bills of $1,196.00. Among the items of clothing billed to Cohen's account and paid for by a union check, were a suit and topcoat for Walker totaling $220.00.

In addition, a Local 107 check for $500.00 was issued to pay for clothing purchased at Diamond & Company by Walker, including an overcoat, suits, topcoat, two pairs of shoes, ties, shirts and a collar pin.

### Trailer Drops

In December 1954 Food Fair was permitted to use trailer drops, which gave them a competitive advantage over Acme and A & P and other chain stores. A trailer drop means that the trailer has been detached from the truck and left at a store. The trailer can then be unloaded at the convenience of the store personnel. It also affords additional storage space for the store. In 1954 Cohen announced that Local 107 would not permit trailer drops. A deal was made with Food Fair officials as a result of which they were allowed to have 283 trailer drops. Lapensohn had asked

50

Louis Stein, president of Food Fair, for some of Stein's stock options on Dan River Mills, Inc. Stein ultimately arranged for Lapensohn to buy 500 shares of Dan River Mills stock at $20.00 a share when the actual value was $29.00 to $31.00. In August and September 1955 Stein arranged for a nominee of Lapensohn and Cohen to purchase Food Fair Properties, Inc. stock substantially below the market value. The names of Cohen and Lapensohn appeared on the list, each to receive 1,000 shares for $1.00 a share and then each name was stricken off and the name of Lapensohn's brother-in-law, Jack Shore, was listed to receive the 2,000 shares. Lapensohn wrote a check for $2,000.00 to Shore, who deposited that check to his account and then Shore issued his check for $2,000.00 to Eastman-Dillon to pay for the stock. At the time he bought the stock for $2,000.00, it was worth $7,000.00. Stein further arranged for Shore, as Lapensohn's nominee, to buy 200 units of Food Fair Properties, Inc. substantially below market value. Lapensohn issued his check for $10,000.00 to Shore on October 3, 1955 in order to enable Shore to issue his check for $10,000.00 to Mandell to pay for the units necessary to acquire the stock. At the time these units were transferred to Shore for $10,000.00, their market value was approximately $14,-000.00. Lapensohn and Cohen received these stocks far below their market value but by so doing they cut down the number of employes which their union would have furnished to Food Fair, thus hurting the union and its members.

## The Kanner Checks

Seven checks were written on the union bank account payable to the order of one Dave Kanner for a total of about $8,000.00. Kanner was identified as one of the union's attorneys. He did not endorse or

cash these checks and he did not authorize any one to sign his name on his behalf. One check payable to the order of Kanner for $1,750.00 was cashed via a forged endorsement at the same bank, on the same date and by the same teller who cashed a $1,750.00 check for Lapensohn, which was deposited to Lapensohn's account. Another forged check for $2,500.00 was dated April 11, 1956. The evidence showed that the check for $2,500.00, payable to Kanner, was given to Lapensohn for transmittal in April of 1956.

## The Katz Check

On January 13, 1956 a Local 107 check for $1,000.00 was issued to the order of one Joseph E. Katz, an attorney who had performed legal services for Lapensohn personally during 1956 but who was never employed by the union. The check was not endorsed by Katz. It was cashed on January 13, 1956 at the Broad Street Trust Company by Teller 41 and on that same date, at the same bank, the same teller cashed a check for $1,000.00, as shown on a deposit slip credited to Lapensohn.

## The Mastrin Check

Philip Mastrin was an architect employed by Local 107 to perform architectural services on a building to be constructed in Wilmington, Delaware. A portion of his bills included an invoice for $1,500.00 dated June 6, 1956, and an invoice for $1,000.00 dated April 26, 1956. This April 26 invoice was marked "Void" by Mastrin at or about that date. A check dated June 7, 1956 was issued by Local 107 to his order for $2,-500.00, signed by Cohen and Grace. Lapensohn took that check to Mastrin, who endorsed it, and then Lapensohn cashed it. Of the $2,500.00, Lapensohn gave

Mastrin $1,500.00 in cash and took $1,000.00 in cash for himself.

## The M. M. Marshall & Company Checks

Morris Marshall & Company is a construction firm with which Local 107 contracted to erect the Wilmington office building. A number of checks were issued by Local 107 to M. M. Marshall & Company. From the records of M. M. Marshall & Company the Commonwealth proved that three checks, issued by Local 107 to M. M. Marshall & Company, were not received and recorded on the books of the company in the normal course of business. These three checks were for $4,800.00, $3,125.00 and $955.00. After an investigation started in this matter, efforts were made to account for the check for $4,800.00. James Cadigan, the F.B.I. expert on questioned documents, testified that high powered microscopic analysis showed that an entry on the Marshall books for $10,080.00 had been erased and raised to $14,800.00, and that the endorsement "M. Marshall" was a forgery. The checks for $3,125.00 and $955.00, which were never entered on the books of M. M. Marshall & Company, were cashed on the same day, at the same bank, by the same teller who cashed one of the Kanner checks and who handled other business for Lapensohn.

## The Grace Checks

Some 23 checks were issued to the order of Joseph Grace, in addition to his regular weekly pay checks, purportedly for travel expenses for trips to Chicago, San Francisco, Washington, New York and numerous other places. Grace was president of the union but died prior to the trial of this case. The indictment against him therefore abated. Dr. Joseph Turci,

Grace's personal physician, testified to the effect that his health precluded such travel and Mrs. Grace testified that her husband never made such trips. These 23 checks were not endorsed by Joseph Grace and most of them were cashed at the Broad Street Trust Company by the same teller and on the same date that Cohen, Walker and Hartsough cashed other checks. While these fabricated and forged expense checks were being cashed at the Broad Street Trust Company, Grace conducted all of his personal banking at the Huntingdon Valley Bank and Trust Company, where he also cashed his pay checks.

## Improper Insurance Payments

Local 107 issued numerous checks payable to the order of Jerome S. Friedman, an insurance broker, which covered personal insurance policies for Cohen, Mrs. Cohen, Grace and Walker. The detail of these checks need not be given. Suffice it to say that these and other checks of the union paid for numerous yacht and home owner policies for Cohen personally and for automobile insurance for Mrs. Cohen's Cadillac convertible for the years 1955 and 1956.

## Miscellaneous Improper Payments to Cohen

On July 16, 1954 a Local 107 check was issued to Cohen for $5,673.80, purportedly for his expenses from January 1954 and running through June 1954. These checks were for reimbursement of expenses allegedly incurred by him prior to the time that he was secretary-treasurer of the union. On July 12, 1954 a union check was issued payable to "Cash," for $1,000.00, which was endorsed by Hartsough. The voucher purported to cover expenses incurred by Cohen in February 1954. After Cohen took control of the union,

he paid himself $7,560.00 in retroactive salary covering the period from January 1, 1954 through June 1954, when he actually became secretary-treasurer. On December 20, 1954 the union issued a check to Mr. and Mrs. Peter Paul for $1,900.00, which covered rental of a house in Florida by Cohen for five months between January and May of 1955.

### The Lapensohn-Cohen Cash Interchange

Lapensohn was the recipient of a large part of the funds siphoned from the Local 107 treasury through the various devices discussed above. A portion of these moneys was traced from Lapensohn to Cohen through three transactions:

1. In late March 1955, Cohen arranged to buy a boat for $18,000.00 from Earl M. Reed through Glen E. Keagle, who acted as the broker. Seventeen thousand dollars of the purchase price was paid by having Lapensohn issue his check to the order of "Cash" for $17,000.00 to purchase a treasurer's check from the Broad Street Trust Company payable to the order of Earl M. Reed. Cohen turned this check over to Glen Keagle, the broker, who then turned the check over to Reed, the seller of the boat.

2. Lapensohn issued his personal check to Raymond Cohen, dated June 20, 1956, for $2,500.00.

3. Lapensohn issued his personal check, payable to the order of "Cash" for $2,000.00 on September 14, 1956 with a notation in the lower left-hand corner "Joe Hartsough" "Ray."

### Summary of Financial Transactions of Cohen

A summary of Cohen's financial transactions from January 1, 1956 through June 30, 1957 showed that Cohen had known total expenses of $118,133.48 and

available funds to spend of \$78,317.72, with a consequent disparity of \$39,815.76.

### International Convention Expenses

On September 16, 1957 checks were written, inter alia, to Cohen, Walker, Elco and Berman for alleged convention expenses. The Walker and Elco checks were endorsed by Hartsough. The Commonwealth contended and proved that these sizeable funds (Cohen, \$3,000.00; Walker, \$2,000.00; Berman, \$2,000.00, and Elco, \$1,570.00) were grossly excessive; that the expenses and legitimate costs at the International Convention were much lower than the amounts taken.

It will not be necessary to detail each of these costs as one will be typical of the others. Walker's hotel bill amounted to \$285.19, his round trip first class plane fare to Miami, Florida, was \$155.87. He was in Florida from September 22, 1957 through October 7, 1957. Allowing the most generous estimate for food and incidental expenses, the jury could properly and reasonably infer that his expenses could not legitimately have totaled \$2,000.00. The jury could well conclude from this evidence that Cohen, Walker, Berman and Elco received checks from the union treasury covering far more than their legitimate expenses to this convention. Hartsough endorsed and cashed the checks of Walker and Elco and therefore all of the six co-conspirators were involved, except Lapensohn, who had left the union in November 1956.

After a thorough consideration of the evidence in this case we are convinced that it was sufficient to sustain the convictions of each appellant.

### Single Conspiracy or Multiple Conspiracy

The appellants argue that the evidence does not sustain a conviction of a single conspiracy but rather

that it tends to prove multiple conspiracies. They argue that the incidents involve different personnel, different objectives, different motives and different means and accomplishments.

The bill of indictment charged a simple overall conspiracy participated in by all appellants to cheat and defraud Local 107 and its members. The learned trial judge, DAVID L. ULLMAN, very carefully and accurately charged the jury on this point. He pointed out to the jury that the real question was "whether two or more of these defendants entered into a single, overall, comprehensive plan to cheat and defraud the union" or whether the evidence showed "multiple, separate, unrelated, distinct instances of cheating and defrauding," and expressly told them that in the event of finding the latter, they could not convict defendants because they were indicted for partaking in one overall conspiracy. The jury found the defendants guilty and we may therefore assume that they found one overall conspiracy. In our judgment, the evidence was sufficient to justify this finding.

It was pointed out in *Com. v. Evans*, supra, at page 202, that "where a criminal scheme has numerous actors and shifting scenes of action the conspiracy is often made out by the association of detached facts and by the reasonable inferences deducible therefrom." The *Evans* case involved a single conspiracy indictment charging that the defendants contrived to defraud the Pennsylvania Turnpike Commission of millions of dollars.

In *Com. v. Fulton*, 56 Pa. Superior Ct. 86, 87, 88, the Court said: "We think it sufficient to say, that after a careful reading of it, we are convinced it tended to establish every ingredient of the offense charged. It showed a long and complicated series of acts, extending over a period of years; the creation of a number of corporations, each and every one of which, how-

ever, constantly remained under the control of the same persons; a line of transactions by which the assets, real or apparent, of one corporation were shifted to the treasury of the next until all of them disappeared from the view of the stockholders who had furnished the real money embraced in the transactions. It exhibited the various steps that had been taken to bring about the final result; that it constantly required the action and co-operation of two or more people to do the things that were done, and it almost irresistibly led to the conclusion that this harmony of action was neither accidental nor born of ignorance of the consequences that would follow. The results that did follow seem to us, as they seemed to the jury, to have been what would naturally be expected, and the appellant has not much ground to complain that the explanation he attempted to offer of these various transactions was not accepted by the jury."

In *Com. v. Spillman, Hays & Coggins,* 74 Pa. Superior Ct. 192, 198, Judge (later President Judge) KELLER said: "Nor was it necessary that the unity of purpose or design requisite to secure a conviction of conspiracy should be manifested by an equal sharing of the spoils among the conspirators or a use of the funds thus obtained in the same enterprise. If the actions of the conspirators showed a common design that one of their number should specially profit as a result of their illegal operations, there was present sufficient unity of purpose or design to secure a conviction. Nor was it essential that it should have been the purpose of the conspirators to wreck the trust company when they embarked on their common enterprise; it was sufficient if there was present a common design to divert the funds of the trust company improperly to their benefit or the benefit of any of them, or to secure profits to themselves or any of them by

devious and unlawful methods to the injury of the trust company: . . . ."

In *Com. v. Strantz,* 328 Pa. 33, 43, 195 A. 75, it is said: "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. In Com. v. Jermyn, 101 Pa. Super. Ct. 455, 465, the Superior Court, speaking through Judge GAWTHROP, aptly said: 'The joint assent of minds required to sustain a charge of conspiracy may be inferred from facts which establish . . . that the conspiracy had been formed.' "

In *United States v. Gilboy,* 160 F. Supp. 442, 454, it is stated: "Neither a multiplicity of objects nor of means convert a single conspiracy into more than one offense. 'The conspiracy is the crime, and that is one however diverse its objects.' . . . A single agreement to commit an offense does not become several conspiracies because it continues over a period of time." At page 455 (quoting from *United States v. Patten,* 226 U.S. 525, 544, 57 L. Ed. 333, 33 S. Ct. 141, 145) : ". . . the character and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."

In *United States v. Rosenberg,* 195 F. 2d 583, 600, 601, the Court said: "What distinguishes a single conspiracy from several related ones is a single unified purpose, a 'common end'. . . . The 'common end' consisted of the transmission to the Soviet Union of any and all information relating to the national defense. . . . Sobell is confusing the particular part each conspirator played in the espionage activities with the end-all purpose of all the conspirators—the aiding of Russia by sending to it any and all kinds of secret information. It did not matter that Sobell knew nothing of the atomic episodes; he is nevertheless charged

with the acts done by Greenglass, Gold and Rosenberg, in furtherance of the over-all conspiracy. The jury could and did reasonably find that Sobell consented to the dominant aim, and so became a member of the Rosenberg-Greenglass-Gold conspiracy."

We are convinced that the evidence in this case reveals a single over-all conspiracy of a continuing character in which each of the defendants was an active participant. The aim of this conspiracy was to cheat and defraud Local 107 through devious and unlawful means and devices. The fact that the conspirators, either individually or in groups, performed different tasks or used different means, or received disproportionate shares of the loot, is of no significance.

### Statute of Limitations

It will be recalled that on September 18, 1959 the grand jury returned a bill of indictment charging the defendants-appellants (including Joseph E. Grace, then Local 107's president, now deceased) with conspiracy to cheat and defraud Local 107 from "on or about June 10, 1954 and thereafter on divers dates continuing to and including September 19, 1957." A check payable to the order of Joseph E. Grace was drawn on the account of Local 107 and dated September 16, 1957. From the face of that check the jury could well infer that it was cashed by someone on September 19, 1957. On that date money was undoubtedly extracted from the union's funds. The check was for the sum of $2,500.00. Making the most generous allowances for extra expenses and plane fare, Grace could not reasonably have spent $2,500.00 for legitimate convention expenses. The jury could reasonably infer that the excess was pocketed by him. The jury also could find from this evidence that the conspiracy continued until at least that date. The Negotiable In-

struments Law in Pennsylvania is emphatic that the crucial date on a check transaction is the date it is presented and collected.

The Uniform Commercial Code provides in §3-409-(1), 12 A. PS §3-409(1) : "A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it." That provision of the Uniform Commercial Code is in line with §189 of the old Negotiable Instruments Act of 1901.

In *School District of the Township of Robinson v. Cook,* 91 Pa. Superior Ct. 207, 212, it is stated: "Sec. 189 of the Negotiable Instruments Act of 1901, P. L. 219, provides: 'A check, of itself, does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder unless and until it accepts or certifies the check.' "

In *Merchants' Bank v. State Bank,* 77 U.S. 604, 647 (10 Wallace's Reports 604, 647), it was stated, in speaking of a check: "It is not due until payment is demanded, and the statute of limitations runs only from that time." This general rule has been expressed in 34 Am. Jur., Limitation of Actions, §154, page 122, as follows: ". . . the correct rule seems to be that the statute begins to run in favor of the drawer not later than the time when the check should have been presented for payment at the bank upon which it is drawn; and since a check must be presented for payment within a reasonable time, it seems that the statute of limitations begins to run at the expiration of a reasonable time after the delivery of the instrument."

The statute of limitations does not run from the time of delivery of the check (September 16, 1957) but would begin to run at the time the check is presented for cashing (September 19, 1957) ; or if not presented

promptly, within a reasonable time after the delivery of the check, whichever occurs first. The Grace check was presented within a reasonable time and the date of cashing, September 19, 1957, is controlling. Thus an overt act within the statutory period was proved.

In *Com. v. Dunie*, 172 Pa. Superior Ct. 444, 447, 94 A. 2d 166, we said: "A conspiracy renewed by repetitions may be prosecuted, and indictment found, at any time within two years after the commission of the last offense, by charging the crime within the statutory period."

In *Com. v. Kirk*, 141 Pa. Superior Ct. 123, 136, 14 A. 2d 914, affirmed 340 Pa. 346, 17 A. 2d 195, we said: " 'The fact that a conspiracy existed on the [31st day of December, 1937] or upon any other day within two years of the exhibiting of the bill of indictment, may be shown by the previous acts, conduct or declarations of the parties. The Statute of Limitations affects the crime, not the proof of it . . . . where in conspiracy an overt act is done within two years, and said act is but one of a series of acts committed by the parties, evidently in pursuance of a common design and to carry out a common purpose, such acts would be evidence, provided they tend to show that the last act was a part of the series and the result of an unlawful combination; and such evidence may satisfy a jury of the existence of a conspiracy at the later period': Com. v. Bartilson, 85 Pa. 482, 489." See also *Com. v. Routley*, 115 Pa. Superior Ct. 125, 131, 174 A. 657, where we said: "Conspirators, by escaping prosecution for two years, do not secure immunity for their continued unlawful acts, done in furtherance of, or pursuance to, the conspiracy, after the two years have expired. A completed conspiracy must be prosecuted within two years after it *ceased;* but a conspiracy renewed by repetitions may be prosecuted, and indictment found, at any time within two years after the commission of

the last offense, by charging the crime within the statutory period. While this conspiracy may have started in 1928, the evidence supported a finding that it was renewed, and the illegal gains participated in by the defendants, up to December, 1931. Hence the prosecution was not barred when the indictment charging the offense as of September, 1930, was returned a true bill at the June 1932, Session."

The cases of *Com. v. Fabrizio,* 197 Pa. Superior Ct. 45, 176 A. 2d 142, and *Com. v. Bartilson,* 85 Pa. 482, are not applicable to the facts of this case. In *Fabrizio* there was no overt act in furtherance of the conspiracy after the initial date. Judge WATKINS who wrote the opinion in *Fabrizio,* was aware of the distinction between the facts in that case and in a case where there was a continuous conspiracy with repetitious overt acts. In *Bartilson* the date of the conspiracy within the two year period was not set forth in the indictment.

At the oral argument counsel for appellant Walker argued that the evidence did not conclusively show that Grace cashed a check on September 19, 1957. We believe that the evidence was sufficient to permit the jury to draw this inference. Accepting for the sake of argument Walker's theoretical hypothesis that Grace did not cash a check on September 19, 1957, the evidence is indisputable that someone did cash it on that date. Even though some unknown person might have cashed the check on that date, the law is clear that there may be a co-conspirator who is unknown and unnamed in the bill of indictment. The indictment in this case did, in fact, charge the defendants with conspiracy "together with divers other persons whose names are as yet unknown." In *Com. v. Bonnem,* 95 Pa. Superior Ct. 496, 501, we held that a defendant could be convicted of conspiracy "where one alone is indicted for a conspiracy with others unknown." To the same

effect see *Com. v. Hoffman,* 103 Pa. Superior Ct. 433, 157 A. 221; *Com. v. Salerno,* 179 Pa. Superior Ct. 13, 116 A. 2d 87. If some person other than Grace cashed the check, then the jury could well find that act was in furtherance of the conspiracy by the unknown, unnamed conspirator.

It has also been argued that an overt act occurred when the officers of the union signed the check for $2,-500.00 and delivered it to Joseph E. Grace, the payee, on September 16, 1957. But certainly another overt act occurred when Grace or some unknown conspirator presented the check to the bank on September 19, 1957 for payment. There is no reason why there cannot be two overt acts in connection with the Grace check. An overt act is an act which is done openly by one of the co-conspirators to accomplish the purpose of the conspiracy to defraud the union. The check bore the endorsement of Joseph E. Grace and the jury could infer that he received the payment of the check on September 19, 1957. That was the date upon which the money was extracted from the union. The Commonwealth having won the verdict, the inference must be drawn most strongly in its favor.

The prosecution against appellant Lapensohn was not barred by the statute of limitations even though he ceased to be connected with the union in November 1956. The jury could have found that Lapensohn committed acts in furtherance of the conspiracy as late as September 14, 1956 when he turned over $2,500.00 to Cohen, and perhaps as late as October 2, 1956 when the forged Kanner and Marshall checks were uttered and even as late as November 1956 when his employment with Local 107 terminated.

It was stipulated by all counsel and parties that Mr. Benjamin Lapensohn was out of the Commonwealth of Pennsylvania, the relevant jurisdiction, from May 10, 1957 until July 1, 1958.

The tolling of the statute of limitations was specifically pleaded in the bill of indictment, as follows: "And the Grand Jury further presents that the said BEN LAPENSOHN from May 9, 1957 and continuously thereafter until July 3, 1958 was not an usual resident or inhabitant of this Commonwealth." The Act of March 31, 1860, P. L. 427, §77, as amended, April 6, 1939, P. L. 17, §1, 19 PS §211, provides as follows: "Provided however, That if the person against whom such indictment shall be brought or exhibited, shall not have been an inhabitant of this State, or usual resident therein, during the said respective terms for which he shall be subject and liable to prosecution as aforesaid, then such indictment shall or may be brought or exhibited against such person at any period within a similar space of time during which he shall be an inhabitant of, or usually resident within this State."

By simple calculation, after taking out the period of thirteen months and twenty days when Lapensohn was not an inhabitant or resident, it is clear that Lapensohn was properly prosecuted in this case. The timeliness of the indictment would be calculated by subtracting from September 19, 1959 (the date when the true bill was found) the period of two years (the normal statute of limitations) plus thirteen months and twenty days (the period of tolling while Lapensohn was outside of Pennsylvania). Thus, by subtracting three years, one month and twenty days from September 19, 1959, the indictment would have been timely providing Lapensohn's participation in the conspiracy were proved through or after August of 1956. The evidence is clear that it was so proved.

The law on this subject is clearly set forth in *Com. v. Wilcox*, 56 Pa. Superior Ct. 244, 252, 253, as follows: "So here we hold that the proviso to sec. 77 was not intended to discriminate and does not between citizens of a foreign state and citizens of Pennsylvania. It says

to either and to both alike, if you have committed a misdemeanor within the portals of the state, you shall not be prosecuted after a period of two years, provided during that period you are an inhabitant or usual resident of the state. But it declares in the same voice, to both, that neither of you shall have the protection afforded by the statute if, during that period, you are not an inhabitant or usual resident of the commonwealth."

The case of *Com. v. Turner,* 176 Pa. Superior Ct. 32, 107 A. 2d 136, is not applicable to the facts of this case because in that case the defendant throughout the entire period appeared regularly at his place of employment every weekday, where he was available for arrest.

We are therefore of the opinion that the statute of limitations did not prevent the prosecution against Lapensohn or any of the other appellants.

## Lack of Authorization

A number of the appellants argue that the Commonwealth failed to prove that the withdrawal of funds from the union treasury was unauthorized and for purposes which were not for the benefit of the union. We believe that a fair reading of the record will reveal that the rank and file of the union could not have successfully opposed the actions of the appellants. Appellants met prior to the meetings of the members to determine just what motions should be presented and then after the meetings they arranged the minutes to suit their purpose. The trial judge characterized this defense as "brazen." It must be remembered that the assets of the union were trust funds and that they could not legally be used for appellants' personal matters, even if authorized by the majority of the union members.

The Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A., §401 et seq., provides that labor union officials abide by the ordinary rules of fiduciary relationship. Section 501(a) states: "The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and . . . to refrain from . . . holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization. . . ."

The same section provides further: "A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy."

That the appellants could not justify using union funds for their own purposes even if they were authorized, was clearly demonstrated in the case of *Highway Truck Drivers and Helpers Local 107 v. Cohen*, 182 F. Supp. 608, affirmed 284 F. 2d 162, cert. denied 365 U.S. 833, 81 S. Ct. 747, 5 L. Ed. 2d 744. In that case the appellants sought to pay their lawyers out of union funds for representing them in these criminal proceedings, based on a resolution adopted by the general membership of Local 107. The Court of Appeals held that the resolution was "invalid because it authorized action beyond the powers of the union as derived from its constitution and was inconsistent with the aims and purposes of the Labor-Management Reporting and Disclosure Act." 284 F. 2d 162, 164.

In a follow-up opinion, filed by Judge Body on April 5, 1963, in *Highway Truck Drivers and Helpers v. Cohen*, Civil Action No. 27053, 220 F. Supp. 735, in the United States District Court for the Eastern District of Pennsylvania, it was decided that Cohen and Walker, among others, must repay to Local 107 all moneys expended on behalf of legal fees for defendants, notwithstanding the prior authorization by Local 107's membership. While this principle may be new to federal law, it has been the law in Pennsylvania and elsewhere for many years. See *Leatherman v. Wolf*, 240 Pa. 557, 88 A. 17.

In 87 C.J.S., Trade Unions, §26, page 791, the rule is stated as follows: "A union's powers must be exercised by its officials in good faith and for valid purposes. Although the legal title to property accumulated by the union from its members is vested in officers, such ownership is of a trust character for the use of individual members."

It must be remembered that, while not on trial for the substantive crime of larceny or stealing of the union's funds, the record really reveals that the appellants could have been convicted of such crimes had criminal action been instituted within the period allowed by the statute of limitations. There can be no valid authorization for criminal conduct: *Com. v. Hansell*, 185 Pa. Superior Ct. 443, 137 A. 2d 816; *Com. v. Kolb*, 13 Pa. Superior Ct. 347. There was no burden upon the Commonwealth to prove lack of authorization: *Com. v. Wiswesser*, 124 Pa. Superior Ct. 251, 188 A. 604.

The Commonwealth did not attempt to shift the burden of proof to the defendants. The distinction between shifting the burden and the time when the Commonwealth has met its burden by introducing the requisite evidence to constitute a prima facie case is

set forth in *Com. v. Bolger,* 182 Pa. Superior Ct. 309, 313, 126 A. 2d 536, as follows: "We are convinced that the evidence of the Commonwealth made out a prima facie case sufficient to compel the defendant to come forward with a defense. Counsel for the appellee cited Com. v. Kolsky, 100 Pa. Superior Ct. 596, for the principle of law that to justify a conviction, where the Commonwealth's evidence tending to connect the defendant with the crime is wholly circumstantial, the evidence of facts and circumstances must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed. This is no longer the law in Pennsylvania. The requirement of the law is stated in Com. v. Bausewine, 354 Pa. 35, 41, 46 A. 2d 491, as follows: 'The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony. The facts and circumstances proved must, in order to warrant a conviction, be such as to establish the guilt of the defendant, not necessarily beyond a moral certainty, nor as being absolutely incompatible with his innocence, but at least beyond a reasonable doubt.' "

### Peremptory Challenges

The trial court permitted the defendants, jointly, six peremptory challenges and the same number to the Commonwealth. The appellants argue that they were each entitled to six peremptory challenges, a total of 36, as against only six for the Commonwealth. This subject has been ruled upon by us heretofore and we need not discuss the subject in detail. The Act of March 31, 1860, P. L. 427, §40, 19 PS §785, provides: ". . . in all cases of joint trials, the accused shall have the right to the same number of peremptory challenges.

to which either would be entitled if separately tried, and no more." There is no constitutional guarantee of peremptory challenges in a criminal trial: *Com. v. Deutsch,* 72 Pa. Superior Ct. 298. It was ruled in *Com. v. Antico,* 146 Pa. Superior Ct. 293, 313, 314, 22 A. 2d 204, that in a conspiracy charge the defendants were together entitled to only six peremptory challenges.

The right to peremptory challenge originated in the legislature and is subject to change or even abrogation by the legislature so long as it does not deny accused a trial by jury "as heretofore". *Com. v. Giambrone,* 183 Pa. Superior Ct. 283, 295, 130 A. 2d 254.

## Sequestration of Jury

It is argued by the appellants that they were denied due process and a fair trial because of the sequestration of the jury. The facts as presented to the court provided ample cause for the action of the trial judge. A nationwide television show was scheduled from ten to eleven that evening in the Brinckley Journal, which featured an exposé of the National Teamsters, including a film clip on Raymond Cohen. An advance script of that program had been obtained from the National Broadcasting System, which was reviewed by the trial judge. A transcript of the proceedings in the recent case of *United States v. Hoffa,* tried in the United States District Court in Nashville, Tennessee, disclosed flagrant efforts to tamper with that jury. Transcripts of those hearings were reviewed by the trial judge. The sequestration of the jury was necessary in order to secure to the appellants and the Commonwealth a fair trial. A large discretion is reposed in the trial judge on this question. There was ample authority for the court's action. *Com. v. Swift,* 44 Pa. Superior Ct. 546.

## Evidence of Other Offenses

Some of the appellants argue that evidence tending to show the commission of other crimes for which they were not indicted, and which, as independent crimes, could not be prosecuted by reason of the statute of limitations, was improperly admitted in evidence. As to this the trial judge made a comment in his opinion which we approve. He said: "It would seem a reductio ad absurdum to contend that a criminal conspiracy can only be established by proof of *legal* acts. If such were the law, then conspirators who implemented their criminal plans only by criminal acts would perforce have to go free for lack of proof of legal acts to accomplish their illegal purpose."

In a conspiracy trial where fraud is involved, there is a wide latitude allowed in the introduction of evidence. In 15 C.J.S., Conspiracy, §92(b), p. 1143, it is stated: "The prosecutor has the right to show the whole history of the conspiracy from the commencement to its conclusion. It is no objection that the evidence covers a great many transactions and extends over a long period of time, that it may show another crime, that the acts, evidence to show which is offered, occurred some time before the alleged formation of the conspiracy, or after its termination, provided, however, that the facts shown have some bearing on and tendency to prove the ultimate fact at issue."

We are of the opinion that the evidence of the other crimes was relevant and material to the proof of the crime of conspiracy to defraud the union.

## Severance

We have held repeatedly that the trial court's refusal of a motion for severance will not be disturbed unless there is a palpable abuse of discretion: *Com. v.*

*Novak,* 165 Pa. Superior Ct. 576, 69 A. 2d 186; *Com. v. Kloiber,* 378 Pa. 412, 106 A. 2d 820.

In *Com. v. Abney,* 195 Pa. Superior Ct. 317, 171 A. 2d 595, fourteen defendants were charged with participating in a riot. We said, at page 323: "All the defendants in this case were charged with conspiracy and with participating in a crime which, by definition, cannot be committed by less than three people. A joint trial is permissible, if not necessary, where the defendants are charged with participating in the same conspiracy and riot, and where much of the same evidence is applicable to all defendants."

### Miscellaneous

It is argued by counsel for appellant Cohen that he was prejudiced when the court refused to permit the cross-examination of the witness Marjorie Battisfore as to her residence. An individual who had been following Mrs. Battisfore was apprehended by a county detective and brought to the trial judge's chambers, where the individual refused to identify himself or discuss the purpose of his activity. It was ascertained that he was an investigator for a private detective agency and had been employed by defense counsel to follow Mrs. Battisfore. The safety of the witness was properly a matter of concern for the court. This was a matter which was within the discretion of the trial judge: *Com. v. Woods,* 366 Pa. 618, 79 A. 2d 408; *Com. v. Horvath,* 187 Pa. Superior Ct. 206, 214, 144 A. 2d 489; *Com. v. Coroniti,* 155 Pa. Superior. Ct. 131, 137, 38 A. 2d 397.

Counsel for appellant Cohen also argues that his client was prejudiced because the court permitted the jury to view a number of cardboard charts which showed the financial transactions of Cohen. The charts were offered for auxiliary and explanatory pur-

poses only and the court, in its charge, correctly advised the jury on this subject. The factual material set forth by the charts was proved by documents obtained from the banks where Cohen dealt and by other documentary evidence showing numerous purchases by Cohen. These charts revealed in detail receipts and expenditures during a period of time relevant to the case and in the final analysis showed that the expenditures exceeded the receipts by $39,000.00. Complaint is also made that the Commonwealth's witness, on cross-examination, admitted that the sum of $8,800.00 in expenditures was not accurate and that the information was obtained from a fire insurance policy covering articles of private property purchased during that period of time. If this item of $8,800.00 were taken out, it would still show that approximately $30,000.00 was spent over and above receipts. This evidence was properly admitted to show motivation for a crime: *Com. v. Burns,* 198 Pa. Superior Ct. 208, 182 A. 2d 232. See also *Com. v. Greenberg,* 339 Mass. 557, 160 N.E. 2d 181, where the court, at pages 581, 582, said: "The Commonwealth called as a witness an accountant who had collated the checks and deposit slips of Greenberg and Maitland which had been admitted in evidence and had listed their dates and the amounts on large charts which were shown to the jury and later admitted in evidence. The defendants assigned as error the admission of these charts. In view of the large number of transactions involved in the trial and the multiplicity of the exhibits bearing on those transactions, the judge could properly find that concise schedules demonstrating the transactions would be helpful to the jury. It was said in Boston & Worcester R.R. v. Dana, 1 Gray 83, that 'in a trial embracing so many details and occupying so great a length of time as the case at bar, during which a great mass of books and documents were put in evidence,' concise state-

ments of their content verified by persons who had prepared them from the originals were the only means for presenting to the jury an intelligible view of the issues involved. Jordan v. Osgood, 109 Mass. 457, 464; Cornell-Andrews Smelting Co. v. Boston & Providence R.R., 215 Mass. 381, 390-391."

Complaint is also made as to the court's ruling permitting the use of a prior consonant statement of a witness whose direct testimony was attacked on cross-examination as being biased and of recent fabrication. This complaint probably refers to the testimony of Harry Graff. In 1954 he was an active supporter of Cohen in his campaign for election as secretary-treasurer of the union. Following Cohen's election, Graff was paid the sum of $100.00 for services rendered and he signed a receipt for that amount. When the sheet was produced at the trial, the figure "100" had been changed to "180". Graff testified that the figure was not in the same form in which he wrote it at the time he received the $100.00. On cross-examination defense counsel brought out that Graff had testified previously concerning this matter in Washington, D.C. during a Senate investigation, and that on this occasion the witness had pleaded the fifth amendment. It was further brought out on cross-examination that the witness was at the time of the present trial a member of Voice, a dissident group with Local 107, whose object was to oppose defendant Cohen and his group. The district attorney made an offer to use a statement signed by the witness in 1958 (prior to the time he pleaded the fifth amendment) given to an investigator for a Senatorial Committee wherein the witness (five years before the present trial and at a time when the witness was loyal to Cohen) stated the history of the transaction just as he described it in the present trial. Defense counsel, by their cross-examination of the witness, were endeavoring to show that at the trial the

witness was hostile because he had changed his loyalty from Cohen to the Voice group. The prior consonant statement, therefore, was properly admitted to offset the picture as presented by defense counsel in the cross-examination of the witness. The admission of such testimony is a matter to be decided in each case by the trial judge in the exercise of a wise discretion and depends largely upon the character and degree of impeachment indulged in by the opposite party: *Lyke v. Lehigh Valley R.R. Co.,* 236 Pa. 38, 50, 84 A. 595. The prior consonant statement was relevant to rebut the inference that the witness' testimony was of recent fabrication: *Com. v. Friedman,* 193 Pa. Superior Ct. 640, 648, 165 A. 2d 678.

It is also contended that the court erred in referring to the testimony of Marjorie Battisfore in a manner which authenticated certain check books as those of Local 107. She did not authenticate any records but she did testify that she knew from her personal knowledge that the check books were kept by Joseph Hartsough and that she recognized his handwriting. As a non-expert witness she was permitted to testify as to handwriting with which she was familiar: *Hershberger v. Hershberger,* 345 Pa. 439, 444, 445, 29 A. 2d 95. We do not believe that, under the circumstances of this case, appellants were prejudiced by the court's comment on this subject.

Counsel for appellants also complain that the court caused the witness, Robert Lazovitz, to testify and produce certain books and records. All that the court really did was to make Lazovitz produce the records of the M. M. Marshall Co. Since these books could have been subpoenaed, we believe there was no error in this connection. The Commonwealth was precluded, under the trial judge's order, from questioning Lazovitz on a number of topics and of this only the Commonwealth could complain.

Other complaints were made as to the admission of testimony and the injection of the judge into the trial of the case and as to parts of the court's charge. To individually discuss each and every one of these matters would unduly prolong an opinion which is already too long. Suffice it to say that we have carefully reviewed each and every one of these contentions and we do not believe that, taken together or separately, they were sufficient to show that the appellants were unduly prejudiced.

We are convinced that Judge ULLMAN retained his composure exceptionally well in a long drawn out, hard fought trial. We are also convinced that the evidence was sufficient to justify the conviction of all appellants and that they received a fair trial.

Judgments of sentence are affirmed and the defendants are directed to appear in the court below at such time as they may be there called, and that they be by that court committed until they have complied with the sentences, or any part of them which had not been performed at the time the appeals were made a supersedeas.

MONTGOMERY, J., concurs in the result.

---

DISSENTING OPINION BY WATKINS, J.:

I would arrest the judgments of sentence and discharge the defendants on the ground that although the indictment found alleges a corrupt conspiracy within the statutory period in that the last overt act was committed on September 19, 1957, the evidence of the Commonwealth shows that the last overt act that extended the existence of the alleged conspiracy took place on September 16, 1957, which was beyond the statutory period. The proof of the Commonwealth is that a check was made by the Union to Joseph E. Grace, one of the defendants, since deceased, on September 16, 1957 and that it was presented for payment and paid

by the Broad Street Trust Company, the drawee, on September 19, 1957 and that this payment was the overt act in furtherance of the conspiracy and within the statute of limitations.

The check in question was dated September 16, 1957 payable to Joseph E. Grace, drawn on the Broad Street Trust Company, Philadelphia, Pa., in the amount of $2500. The maker was Highway Truck Drivers & Helpers, Local 107, Raymond Cohen, Secretary, Joseph E. Grace, President, and delivered to Grace on the date it was made. The check which was introduced into evidence was indorsed in blank by Joseph E. Grace and was paid by the bank on September 19, 1957.

We agree with the majority opinion that a check or draft does not operate as an assignment of funds in the hands of the drawee bank but we are not interested in the drawee, we are only interested in the maker and the payee. The delivery of this negotiable instrument into the hands of Grace became a completed transaction and, if a part of this alleged corrupt conspiracy, a completed overt act, a completed crime. This check was a thing of value, a negotiable instrument that could be negotiated at any time by delivery. He could do this by indorsing it in blank and delivering it to anyone. If, as contended by the Commonwealth, the convention payments constituted illegal acts, and part of the conspiracy, the crime was completed on the delivery of the check.

The Commonwealth proved the making and the delivery of the check to Grace on September 16, and from then on what happened to this "bearer" instrument is pure conjecture, even if material. The evidence shows that the Broad Street Trust paid out the money on a bearer instrument but there is no evidence to whom it was paid and it is pure guesswork to argue that it was paid to Grace.

There is no statute, regulation or duty which prevents a bank from making payment of a check to someone other than the indorser where the check is a bearer instrument without requiring the indorsement of the person who presents it. Uniform Commercial Code, 12A PS §4-101 et seq., Bank Deposits—Collections. "An indorsement in blank specifies no particular indorsee and may consist of a mere signature. An instrument payable to order and indorsed in blank becomes payable to bearer and may be negotiated by delivery alone until specially indorsed." Uniform Commercial Code, 12A PS §3-204.

The delivery of the negotiable instrument in the form of this check is exactly the same as if it were cash or a negotiable bearer bond. A check is a chattel, a valuable security. *Com. v. Rosicci*, 199 Pa. Superior Ct. 609-616, 186 A. 2d 648 (1962). The overt act was then complete and what happened when the check was negotiated is immaterial, exactly the same as evidence of what was done with the cash or the bond or its proceeds, unless, of course, there was evidence that the proceeds were divided among conspirators, which doesn't appear in this case.

This Court held in *Com. v. Petrosky*, 194 Pa. Superior Ct. 94, 166 A. 2d 682 (1960), that a delivery of a check by the State Treasurer to the Postmaster in Dauphin County was sufficient delivery to the defendant to establish the commission of a crime in that county so that the overt act was complete at that time. We specifically held that the overt act was the delivery of the check, the postmaster being the agent of the defendant and the fact that the check's ultimate delivery and cashing took place in another county was not material.

This Court held that a prosecution for criminal conspiracy could be brought in the county where the unlawful combination took place or in any county where

an overt act was committed by any of the conspirators in furtherance of that unlawful conspiracy. *Com. v. Prep,* 186 Pa. Superior Ct. 442, 142 A. 2d 460 (1958): "An overt act is distinguished from that which rests merely in intention or design; and as used in the law of conspiracy it means an act done in furtherance of the object of the conspiracy." *Com. v. Mezick,* 147 Pa. Superior Ct. 410, 413, 24 A. 2d 762 (1942). The overt act in the *Prep* case was the delivery of a Commonwealth check, payable to Prep, to the postmaster; that the postmaster was the agent of Prep so that delivery to him was delivery to Prep. And we said at page 449, "This relationship between Prep and the Commonwealth as parties to the cinder contract forms the basis for the only logical conclusion that the transaction was completed when the checks were mailed."

The overt act in the instant case was the delivery of the check to the defendant on September 16, so that an indictment handed down on September 18, charging a conspiracy that depended on the overt act of the Grace check to extend the conspiracy was too late.

It should be pointed out that with all the charges that have been bandied about for months through the communications media concerning the gross corruption of Cohen in Local 107, it is regretful, to say the least, that the successful prosecution of this conspiracy depends on the acceptance of alleged excessive convention expenses within the statutory period and that requiring a judicial determination whether within or without by one day.

As we said in *Com. v. Fabrizio,* 197 Pa. Superior Ct. 45, 58, 176 A. 2d 142 (1961): "Conspiracy, because of its peculiarly broad application, has come to be used as a catch-all crime, especially in those cases where the prosecution has great difficulty in proving a specific crime . . . Because of the nature of the crime of conspiracy, it is, therefore, necessary that indictments

charging it should be strictly construed as to the dates and incidents of the conspiracy, especially as to the application of the statute of limitations."