Commonwealth *v.* Giambrone et al., Appellants.

284

Argued December 28, 1956. Before HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ. (RHODES, P. J., absent).

*Frederick B. Smillie,* with him *Paul A. Davis, 4th, and Smillie, Bean, Davis & Tredinnick,* for appellant.

*Leon H. Fox,* for appellant.

*Richard S. Lowe,* Assistant District Attorney, with him *Bernard E. DiJoseph,* District Attorney, for appellee.

OPINION BY GUNTHER, J., March 20, 1957:

Defendants, Samuel Giambrone, Gus Giovinco and Philip Giovinco were charged with and convicted of establishing a gambling place and having set up a dice game in a certain building under their possession, occupancy and control. They were also charged with conspiracy to set up a dice game but, in view of their conviction and sentence on the main charge, sentence on this latter charge was properly suspended. Giambrone and Gus Giovinco were charged in Bill No. 196 June Term, 1955, with establishing a gambling place

and having set up a dice game, and at Bill No. 196-1 June Term, 1955, they were charged with conspiracy to set up a dice game. Philip Giovinco was charged in Bill No. 205 June Term, 1955, with establishing a gambling place, and at No. 205-1 June Term, 1955, he was charged with conspiring with Giambrone and his father, Gus Giovinco, to set up a dice game.

After a three day trial, the jury returned verdicts of guilty against all defendants on all bills and on all counts. Subsequently, Giambrone filed a motion for a new trial, and Gus and Philip Giovinco filed motions for a new trial and in arrest of judgment. All motions were overruled and refused. On September 14, 1956, Samuel Giambrone was sentenced to pay a fine of five hundred dollars and serve six months in the Montgomery County Prison; Gus Giovinco was sentenced to pay a fine of five hundred dollars and serve six months in the same prison, and Philip Giovinco was sentenced to pay a fine of two hundred dollars and placed on probation for a period of one year. None of the defendants took the stand in his behalf although testimony was offered in defense to the charges.

At 2:15 A.M. on the morning of July 10, 1955, a detail of state police raided the establishment located between 106 and 108 DeKalb Street, Bridgeport, Montgomery County. This two story stucco building was known as 106 DeKalb Street but the part raided had no number of its own. It was known as Giambrone's pool parlor. This establishment was under surveillance on four different days prior to the raid. Detective Moody of the Pennsylvania State Police stated that during these periods, he observed that even though the lights in the establishment would be extinguished at midnight, activity still continued. He saw men going in and out of the establishment at all hours of the early morning. To gain admission, the visitor had to be identified by a person on the inside of the building

looking through a peep-hole and, if properly identified, a buzzer device or arrangement on the latch of the outside door would go off to release the lock and admit the person. The admitted person would then walk through a foyer to the door with the peep-hole and through it to another portion of the building. This foyer had no furniture in it and the window facing the street from the foyer had no designation on it to show that it was a pool room or anything.

On July 9, 1955, Detective Moody obtained a search warrant, on proper affidavit, for the premises at 106 DeKalb Street, Bridgeport, being a two story stucco building. The premises adjacent to this structure was a two story brick building which later turned out to be known as 108 DeKalb Street. The raid was made on premises contained in the two story stucco building. However, after the raid, the officer being confused as to the numbering of the premises raided and thinking that the building actually raided was 108 DeKalb Street, the number on the search warrant was changed from 106 to 108. On the morning of the raid, when the police appeared at the door of the pool room and pressed the buzzer in order to gain entrance, the party peering through the peep-hole refused to admit them and the door had to be broken down. The door containing the peep-hole likewise was broken down. As entrance was gained into the pool room, Detective Moody noticed all the men in the room retreat to a rear room. The defendant, Samuel Giambrone, was seen to leap up on the pool table and then leap down and run to the rear room. Later on, Giambrone admitted to Detective Moody that he was the proprietor and that it was his game.

The so-called pool room to which entrance was obtained measured fifteen by twenty feet. This room contained a pool table in the center. Over the pool table were two drop lights. All the cue sticks were

in the racks, indicating that no pool game was in progress. On the pool table were found sixteen quarters and three cards with the following numbers back to back: four and ten, six and eight, five and nine. Detective Moody testified that the purpose of these cards was to show the number the dice player sought to make as the dice were rolled. These cards are operated by a so-called "stick man" and, as the roll of the dice is made for the "point" or number the player must make in later rolls in order to win, the "stick man" places that number on the card on the table to make certain of the number the player is seeking to roll and to eliminate confusion or arguments. It was also testified to that inasmuch as the odds are the same for four and ten, six and eight and five and nine, these numbers are placed back to back. A cigarette machine located in this room was found to contain five new dice and two new decks of playing cards. The rear room was described as being twelve by fifteen feet long, containing a round table with four or five chairs and playing cards on the table. Other playing cards were found on the shelves in this room. The door from this room to the outside rear was barricaded. Upon a search of this room one dice was found under the pillow of the sofa and four dice were found under the sofa.

At the time of the raid, twenty-four men were found on the premises including defendants Giambrone and Gus Giovinco. Twenty-two men posted bonds before a justice of the peace for further hearings on charges of disorderly conduct. Most of these men were from communities and counties other than that in which the premises were located. Varying amounts of money were found on the possession of these men ranging in amount up to twelve hundred dollars. On the person of Samuel Giambrone a total of $1518.00 was found, of which it was later claimed that $1500.00 be-

longed to Samuel Giambrone and his wife and was to be used for the purchase of restaurant equipment the following Monday. Gus Giovinco had $18.00 on his person which was returned.

When Gus Giovinco was questioned at the time of the raid, he stated that his son, Philip Giovinco, was the owner of the property but that he had his attorney write a letter to the owner next door to stop gambling. While the agreement for the purchase of the property was entered into on March 29, 1955 by Philip Giovinco, it was Gus Giovinco who ordered that letters be sent to the tenants, prior to closing the transaction, to give up possession of the property. Squire Turley, who was handling the sale of said property, first contacted Gus Giovinco by telephone and then later went out to his riding academy in Norristown and it was Gus Giovinco who discussed the price; it was to him that the reduction in the sales price was reported, and it was he who gave $1,000.00 hand money in cash at the time the agreement of sale was signed, although he did state that the money belonged to his son. At the time of settlement, Gus Giovinco appeared with his own attorney and his son and it was Gus Giovinco who did all the talking. The electric bills for the premises were not forwarded to Philip Giovinco but to his father. Philip had an entirely different address. When Samuel Giambrone was questioned by the police at the time of the raid, he first stated that he paid rent for the property to a man on Wood Street, and later investigation showed Gus Giovinco as the person who lived on Wood Street. When Giambrone later stated he had paid rent to an attorney, it was established that the attorney concerned was Gus Giovinco's attorney. These and other factors in the case established with reasonable certainty that Philip Giovinco was merely an accommodation party or "straw

man" in the entire transaction and that Gus Giovinco, in fact, was the owner of the premises raided.

On these appeals defendants contend (1) that the verdicts were against the weight of the evidence; (2) that the search warrant issued was illegal and the evidence obtained thereunder should have been suppressed as well as the indictments; (3) that it was improper to consolidate the indictments for joint trial; (4) that defendants were deprived of, or that the Commonwealth exceeded, the number of peremptory challenges authorized by law; (5) that the trial court erroneously excluded certain requests for charge; and (6) that during the course of the summation, the district attorney made prejudicial remarks.

A careful review of the evidence clearly shows that there was sufficient evidence upon which the verdict of the jury as to Samuel Giambrone and Gus Giovinco may be sustained. While the quantity of paraphernalia which could be used in a gambling establishment was not considerable, it was sufficient to indicate that these defendants were engaged in setting up and maintaining a gambling establishment. And while reasonable inferences of guilt must be based on facts and conditions proved and not solely on suspicion or surmise, we are of the opinion that sufficient facts were presented to sustain the verdict. In addition to what we have stated in the review of the facts and circumstances, we might add that if this pool parlor was a legitimate place of recreation open to the public, it would not have been necessary to devise a buzzer system to open locked doors nor to construct a peep-hole door with another lock before gaining admission to the pool parlor. Furthermore, the jury had a right to consider that the patrons of this establishment came, for the most part, from other areas and counties than the one in which this establishment was located. It

is highly significant to point out that although at 2:15 A.M. on the morning of the raid twenty-four persons were found on the premises, not a single one was engaged in the relaxing pastime of playing pool. No pool balls were found on the table and the cue sticks were all in the racks. Instead of these items usually found, the police officers found sixteen quarters on the pool table with cards back to back which are usually and ordinarily used in conducting a dice game or other gambling.

The facts and circumstances, in order to warrant conviction, must be such as to establish the guilt of the defendants, not necessarily beyond moral certainty, nor as being absolutely incompatible with innocence, but at least beyond a reasonable doubt. *Commonwealth v. Gregory,* 183 Pa. Superior Ct. 53, 127 A. 2d 788; *Commonwealth v. Bolger,* 182 Pa. Superior Ct. 309, 126 A. 2d 536. In *Commonwealth v. McClurg,* 142 Pa. Superior Ct. 305, 16 A. 2d 149, we sustained the charge of establishing and maintaining a gambling house where there was testimony showing directions from the defendant to one of the actual operators as to what that operator should do and what the defendant would do with relation to the conduct of the business. We held this evidence, together with other, was sufficient to sustain the verdict. Here we had a direct admission by one of the defendants to the effect that he was the proprietor and that it was his game. While mere presence of a defendant in a gambling establishment is insufficient for conviction (*Commonwealth v. Zotter,* 131 Pa. Superior Ct. 296, 200 A. 264), if evidence is produced, as here, from which defendant's proprietorship of the establishment may reasonably be inferred, the conviction may be sustained. In *Commonwealth v. Palace,* 164 Pa. Superior Ct. 58, 63 A. 2d 511, we held that the crime charged may be wholly sus-

tained by circumstantial evidence where the circumstances proved are such as reasonably and naturally justify an inference of guilt and are of such volume and quality as to overcome the presumption of innocence.

These proceedings were brought under section 605 of the Penal Code of 1939, P. L. 872, 18 P.S. section 4605. This section, inter alia, provides: "Whoever, being the owner, tenant, lessee or occupant of any premises, leases, hires, or rents the same, or any part thereof, to be used and occupied, or employed for the purpose of playing at, or staking and betting upon such game or device of address, or hazard, for money or other valuable thing, is guilty of a misdemeanor, . . ." The testimony reasonably discloses that Gus Giovinco, in fact, was the owner of the gambling establishment and that he exercised dominion over it and was present therein. Aside from the other considerations in the case, this alone would sustain the verdict as to him.

The attack on the search warrant centers around the fact that Detective Moody, after the raid, changed the address contained in the search warrant from 106 to 108 DeKalb Street. The legality of the search warrant does not depend on what changes were made therein after the search is completed but rather upon whether it was properly made out in the first instance. Here the proper affidavit was made therefor and was properly signed; the property described was a two story stucco building located at 106 DeKalb Street; the officer knew the building, having had the same under surveillance on four previous nights to the raid; the officer made the raid on the pool parlor and did not raid any other establishment. When officer Moody made the raid, he saw 106 on another part of the same building and erroneously assumed that the raided establishment was 108 DeKalb Street. However, the premises

in question were known as 106 DeKalb Street and the warrant was correct in the first instance. *Commonwealth v. Connolly,* 290 Pa. 181, 138 A. 682; *U. S. v. Yatsko,* 23 F. Supp. 879. Assuming for the moment, however, that the search warrant was not legal, it does not mean that evidence so obtained could not be introduced. See *Commonwealth v. Chaitt,* 380 Pa. 532, 112 A. 2d 379; *Commonwealth v. Dabbierio,* 290 Pa. 174, 138 A. 679. Furthermore, we mention in passing that the validity of seizure of gambling paraphernalia does not necessarily depend on the validity of the search warrant. Under section 60 of the Act of March 31, 1860, P. L. 382, 18 P.S. section 1445, items of gambling paraphernalia are subject to seizure with or without a warrant. See *Commonwealth v. Bruno,* 176 Pa. Superior Ct. 115, 106 A. 2d 905.

The next complaint relates to the consolidation of indictments for a joint trial and the refusal of the trial court to grant separate trials. We have stated time and again that the consolidation of a number of bills of indictment for the trial of one or more defendants is within the discretion of the trial judge, and the ruling of the court will not be disturbed unless it clearly appears that the rights of the defendants have been prejudiced thereby: *Commonwealth v Cauffiel,* 97 Pa. Superior Ct. 202; *Commonwealth v. McCord,* 116 Pa. Superior Ct. 480, 176 A. 834; *Commonwealth v. Morrison et al.,* 180 Pa. Superior Ct. 133, 118 A. 2d 263. The trial court is called upon to rule on the consolidation of indictments for trial before any evidence concerning the charges are presented. It must determine from the nature of the charges and the parties whether, in fairness to all concerned, it should sever or consolidate. In the absence of persuasive reason presented at that time, the trial court cannot be charged with error in consolidating the indictments.

As applied to the instant cases, to have granted separate trials would have entailed a repetition of the same testimony and imposing upon the Commonwealth a heavy and unnecessary burden of expense and duplication of effort. All the charges grew out of the same occurrences. There was a close relationship between the substantive offenses and the conspiracy which, we believe, justified the joint trial. In general, defendants charged with conspiracy should be tried together: *Commonwealth v. Hartman*, 31 Pa. Superior Ct. 364; *Commonwealth v. Antico et al.*, 146 Pa. Superior Ct. 293, 22 A. 2d 204; *Commonwealth v. McCord*, supra. As stated by Justice BELL in *Commonwealth v. Kloiber*, 378 Pa. 412, 415, 106 A. 2d 820: "Especially is a joint trial permissible, if not advisable, when the crimes charged grew out of the same acts and much of the same evidence is necessary or applicable to both defendants: (citing cases)." Where, as here, the indictments are closely related, such consolidation will not furnish grounds for reversal unless the defendants have been prejudiced thereby. *Commonwealth v. Krzesniak*, 180 Pa. Superior Ct. 560, 119 A. 2d 617.

The trial court allowed the defendants, together, eight peremptory challenges and the same number to the Commonwealth. Appellants now contend that this was error in that each defendant should have been entitled to six challenges, or a total of eighteen as against six challenges allowable to the Commonwealth. By the Act of March 31, 1860, P. L. 427, section 40, 19 P.S. section 785, it is provided that "in all cases of joint trials, the accused shall have the right to the same number of peremptory challenges to which *either* would be entitled if *separately* tried, and no more." (Italics supplied.) The Act of 1901, March 6, P. L. 16, section 1, as amended, 19 P.S. section 811, provides for six peremptory challenges to the Commonwealth

and to the defendant. The allowance of more to each side could not be considered prejudicial so as to require a new trial. But to allow defendants three times the number of challenges permitted to the Commonwealth is not warranted under the law. There is no *constitutional* right to *any* peremptory challenges. It is legislative in origin and is subject to change or even abrogation by the legislature so long as it does not deny accused a trial by jury "as heretofore." *Commonwealth v. Antico et al.,* supra. We therefore find no merit to this argument. *Commonwealth v. Deutsch,* 72 Pa. Superior Ct. 298.

The next complaint refers to the refusal of the trial court to charge on certain points requested. However, upon review of the points requested and the rulings and the reasons therefor, we hold that the trial court properly ruled thereon and there is no basis for disturbing such rulings. We deem it unnecessary to detail and extend discussion on this point.

Finally, it is contended that the district attorney, during the course of his summation, made prejudicial remarks against Samuel Giambrone. He referred to this defendant by his name and added "also known as Cuba," which was the alias contained in the indictment. It is contended that this reference to the defendant Giambrone was so prejudicial, especially since no evidence was introduced to show that he was known as Cuba, as to justify the withdrawal of a juror. We agree with the statement of the learned trial court to the effect that "in order to justify a reversal, the language of the prosecuting officer must have been such that its unavoidable effect was to prejudice the jury and to inflame them with passion and bias." This reference was in no way so prejudicial, if at all, to justify a reversal. *Commonwealth v. Molinari,* 179 Pa. Superior Ct. 427, 115 A. 2d 389; *Commonwealth v. Morrison,* 180 Pa. Superior Ct. 121, 118 A. 2d 258.

We find no errors requiring reversal so far as Giambrone and Gus Giovinco are concerned. However, upon a review of the record, we are of the opinion that the conviction and sentence of Philip Giovinco must be reversed. In the entire record there is nothing which could connect him with setting up or maintaining a gambling establishment. He was not on the premises at any time so far as the evidence discloses. While the premises in question were in his name of record, the evidence amply discloses that he was merely a "straw man" in the transaction and the real owner was Gus Giovinco. Outside of the bare legal title, the Commonwealth frankly admits that there is nothing to connect him with the charge.

The judgment and sentence of Philip Giovinco on Bills 205 and 205-1 are reversed and he is ordered discharged.

The judgment and sentence of Samuel Giambrone and Gus Giovinco are affirmed.