Commonwealth *v.* Kubacki et al., Appellants.

524

Argued June 13, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and SPAULDING, JJ. (HOFFMAN, J., absent).

*John E. Ruth,* with him *Marx, Ruth, Binder & Stallone,* for appellant.

*Bernard Edelson,* with him *B. Nathaniel Richter, John A. McMenamin, Lawrence Lieberman,* and *Richter, Lord & Cavanaugh,* for appellant.

*James M. Potter,* with him *Liever, Hyman & Potter,* for appellant.

*W. Richard Eshelman,* District Attorney, with him *Ralph J. Althouse, Jr.,* Assistant District Attorney, for Commonwealth, appellee.

OPINION BY MONTGOMERY, J., November 17, 1966:

Appellant John C. Kubacki appeals from a judgment of sentence following a jury verdict of guilty on an indictment charging (first count) conspiracy to do an unlawful act and (second count) extortion by color of office (Mayor of the City of Reading).

Appellants Abraham Minker and Benny Bonanno also appeal from judgments of sentence following a jury verdict of guilty on an indictment charging them jointly with (first count) conspiracy to do an unlawful act and (second count) aiding and abetting extortion by John C. Kubacki by color of his office as Mayor of the City of Reading.

Appellants were tried together and their appeals will be considered in the same manner.

The aforesaid indictments were consolidated for trial for the reason that the alleged offenses arose out of one continuing transaction or course of conduct under a single scheme or plan, namely: ". . . taking . . . of fees or payments not allowed by law from Angeline Martin Wilkerson, for permitting her to operate a bawdy house in the said City of Reading without interference from the police of the said City of Reading . . ."

Post-trial motions filed by each appellant for a new trial and in arrest of judgment having been refused, these appeals followed.

Only Kubacki and Bonanno question the propriety of the consolidation order. The consolidation of a number of indictments for the trial of one or more defendants is within the sound discretion of the trial judge, the exercise of which will not be reversed except for abuse; and to establish abuse there must be a clear showing that the defendant was prejudiced. *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A. 2d 820 (1954), cert. denied, 348 U.S. 875, 75 S. Ct. 112, 99 L. Ed. 688. The law on this subject was reviewed thoroughly by this Court in *Commonwealth v. Evans*, 190 Pa. Supe-

rior Ct. 179, 154 A. 2d 57 (1959), affirmed 399 Pa. 387, 160 A. 2d 407, cert. denied, 364 U.S. 899, 81 S. Ct. 233, 5 L. Ed. 2d 194, and again in *Commonwealth v. Sindel,* 205 Pa. Superior Ct. 355, 208 A. 2d 894 (1965).

Bonanno's arguments against consolidation are: (1) Kubacki was subject to adverse publicity because of a previous trial and therefore a joint trial with him was prejudicial to Bonanno; (2) he was further prejudiced because the key witness for the Commonwealth was Charles S. Wade, a former Chief of Police, whose testimony dealt in a large measure with the other defendants, Kubacki and Minker, and very little with Bonanno; and (3), consolidation resulted in limiting to six the number of peremptory challenges allowed to the defendants jointly. Kubacki argues that Wade's testimony was hearsay as to him and, being admissible only as to Bonanno, prejudicial as to him, Kubacki. He also asserts as error the limitation on the number of challenges.

It is not uncommon in the trial of more than one indictment for some evidence to be competent and relevant as to one or more indictments and incompetent and irrelevant as to others. However, the test is whether there is prejudice, *Commonwealth v. Evans,* supra; *Commonwealth v. Giambrone,* 183 Pa. Superior Ct. 283, 130 A. 2d 254 (1957); and this is generally determined by the adequacy of the instructions given the jury. Although the decision to consolidate is made before trial, our examination of the record of testimony, including rulings on same and the charge of the court, leads us to conclude that proper limitations were placed on the relevancy of the evidence so that it would be considered in a proper manner by the jury and as not to prejudice other defendants. We find that the rights of Kubacki and Bonanno were fully protected and that there was no prejudice to either of those defendants on account of the admission of the evidence of Wade.

The Act of March 6, 1901, P. L. 16, §1, amended by the Act of July 9, 1901, P. L. 629, §1, 19 P.S. §811, providing for six peremptory challenges to the Commonwealth and to the defendant in cases of most misdemeanors, has been interpreted to mean defendant or defendants, the number not to be multiplied by the number of individual defendants. *Commonwealth v. Giambrone,* supra. This decision was made on the interpretation given the Act of March 31, 1860, P. L. 427, §40, 19 P.S. §785, which provides that, ". . . in all cases of joint trials, the accused shall have the right to the same number of peremptory challenges to which either would be entitled if separately tried, and no more." Although this act refers to persons jointly indicted in its opening clause, we fail to see any sound reason for distinguishing between defendants indicted separately from those indicted jointly in determining the number of peremptory challenges to which they are entitled, and we interpret that act to mean the same in either case. *Commonwealth v. Antico,* 146 Pa. Superior Ct. 293, 22 A. 2d 204 (1941), is in accord. There is no constitutional right to peremptory challenges. Furthermore, defendants had full opportunity to raise any questions concerning the jurors when they were being selected and not having made any objections or additional requests, they are precluded from raising any questions at this time. *Commonwealth v. Cohen,* 203 Pa. Superior Ct. 34, 199 A. 2d 139 (1964), cert. denied, 379 U.S. 902, 85 S. Ct. 191, 13 L. Ed. 2d 176. Bonanno's remaining objection to consolidation concerns his association with Kubacki and will be disposed of later in this opinion.

Bonanno and Minker offered the defense of double jeopardy because of the continuance of the trial from January 28, 1965, when it was first called and a jury selected and sworn, to March 16, 1965, when it was finally tried before another jury. The facts leading up to the continuance are as follows: On January 27,

1965, the consolidated trial of all defendants was called and the jury was selected and duly impaneled. Before the jury was selected Kubacki and Minker had objected to proceeding because Kubacki was then awaiting the verdict in another case in which he was charged with another act of extortion. Bonanno, at that time, did not object but insisted on proceeding. The objections of Kubacki and Minker were overruled at that time. On the next day, January 28, before the trial started, the matter was discussed further by the court and counsel after the court had taken notice of the facts that Kubacki had been acquitted in his separate trial and that the Reading Times, the local newspaper, had published the names and addresses of the jurors who had served in that case. Because of this listing of the jurors and their home addresses, the court thought some coercion on other jurors from that panel might result. For that reason the court indicated to counsel that it might reconsider its rulings on the motions filed the preceding day. Thereupon Kubacki renewed his motion for a continuance and included in it a request for a severance. The District Attorney opposed the motion for a severance but agreed to the motion for a continuance. Bonanno and Minker insisted that the trial proceed. Finally, after lengthy argument, an order was entered which read, "On the motion of Mr. Ruth, representing the defendant, John C. Kubacki, for the withdrawal of a juror and continuance of the case, based upon all we said this morning, joined in by the Commonwealth, opposed by Mr. Richter, counsel for Mr. Minker, and opposed by Mr. Liever, counsel for Mr. Bonanno, the motion is granted."

In view of the fact that the trial was postponed for two months after the return of the verdict in Kubacki's first case, we find no merit in Bonanno's objection to the consolidation on the basis that his joinder with Kubacki therein was prejudicial.

On the question of double jeopardy raised by Bonanno and Minker, the law of Pennsylvania is, that the concept of double jeopardy is not considered in noncapital cases. *Commonwealth v. Baker,* 413 Pa. 105, 196 A. 2d 382 (1964). Furthermore, as stated in *Commonwealth ex rel. Farrow v. Martin,* 387 Pa. 449, 451, 127 A. 2d 660, 661 (1956), cert. denied, 353 U.S. 986, 77 S. Ct. 1288, 1 L. Ed. 2d 1144, "One is placed in double jeopardy if he has received an acquittal or its equivalent, or a sentence which is no longer subject to attack. Until such legal sentence is imposed, the jeopardy in which he was placed, when first tried, must be deemed to continue until the time of imposition of legal sentence at the subsequent trial. 'Until a convicted prisoner receives a sentence which can withstand attack, it may be conceived that *his original jeopardy continues* without interruption, and that he is therefore not put in jeopardy a second time when he receives his first valid sentence': . . ." Thus there would be no merit in defendants' plea of double jeopardy under this statement of Pennsylvania law. See also *Commonwealth v. Baker,* supra, and *Commonwealth v. Melton,* 406 Pa. 343, 178 A. 2d 728 (1962), cert. denied, 371 U.S. 851, 83 S. Ct. 93, 9 L. Ed. 2d 87.

However, we are urged to adopt the meaning of double jeopardy as used by the Federal Judiciary in construing the Fifth Amendment to the United States Constitution, which is identical with the provisions of the Pennsylvania Constitution. Defendants Bonanno and Minker argue that the Due Process Clause of the Fourteenth Amendment compels us to do so and they cite *United States ex rel. Hetenyi v. Wilkins,* 348 F. 2d 844 (2d Cir. 1965); *Pointer v. Texas,* 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *Griffin v. California,* 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106

(1965); *Malloy v. Hogan,* 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964), in support of their argument.

Although double jeopardy is considered in non-capital cases arising under federal law, there is no definite United States Supreme Court decision imposing that interpretation on state courts where state crimes are involved. The opinion in *United States ex rel. Hetenyi v. Wilkins,* supra, is very exhaustive and enlightening. It sets forth at great length what standards may be considered in determining the limitations the Due Process Clause of the Fourteenth Amendment of the United States Constitution imposes on a state's power to reprosecute an individual for the same crimes, i.e., (a) The Federal Standard; (b) The Basic Case Standard; and (c), The Fundamental Fairness Standard. However, whatever standard was selected and followed in that case, the same result would have been reached under Pennsylvania laws and standards. The defendant in that case having been charged with murder in the first degree, on his second trial was found to have been guilty only of second degree murder. It was there held that he could not thereafter be tried again for first degree murder. See *Commonwealth v. Simpson,* 310 Pa. 380, 165 A. 498 (1933), for the same result under Pennsylvania law. Until the United States Supreme Court decides that the Pennsylvania interpretation of double jeopardy violates the United States Constitution we are bound by the law as stated in *Commonwealth v. Baker,* supra, and *Commonwealth v. Simpson,* supra. See also *Commonwealth ex rel. Montgomery v. Myers,* 422 Pa. 180, 220 A. 2d 859 (decided June 24, 1966).

Regardless of the reason stated in the preceding paragraph for rejecting defendants' argument, the circumstances of this case would compel us to affirm the rejection of defendants' pleas of double jeopardy although we followed federal decisions. The purpose of

the learned trial judge, the Honorable WARREN K. HESS, was to save the defendants from any effect of coercion the newspaper article might have had on the first jury which had been selected to try them. When the case was originally listed for trial the District Attorney probably felt he could secure a conviction of all defendants. However, after the newspaper article appeared he did not seek to take an undue advantage of the defendants. Although he did insist on a consolidated trial, he was, nevertheless, agreeable to trying the case immediately or subsequently. It was the trial judge who first raised the question as to whether the ends of justice might be served by proceeding with the first jury, and it was he who was first aware of the newspaper article. He directed counsels' attention to it, at the same time inviting them into his office for a discussion of it. We conclude that under the circumstances the trial judge did not abuse his discretion in declaring that another jury panel was necessary, although it was contrary to defendants' wishes. The defendants' pleas of double jeopardy were properly rejected. *The rule of discretion meets the favor not only of our courts, but of federal courts as well.* United States v. Tateo, 377 U.S. 463, 84 S. Ct. 1587, 12 L. Ed. 2d 448 (1964); *Gori v. United States,* 367 U.S. 364, 81 S. Ct. 1523, 6 L. Ed. 2d 901 (1961); *Brock v. North Carolina,* 344 U.S. 424, 73 S. Ct. 349, 97 L. Ed. 456 (1953); *Commonwealth ex rel. Montgomery v. Myers,* supra.

All defendants assign as error the ruling of the trial judge in denying their counsel the right to examine the transcript of a statement made by the witness Wade to the investigating officers. The transcript was made from a tape recording which had been made by that witness on his own recording device. The tape, having been reused after the transcript was made from it, was unavailable at the trial for that reason.

Reference to this statement was made by the prosecuting officer, D. W. Holloway, a member of the Pennsylvania State Police, during his interrogation which preceded that of Wade. At the conclusion of Wade's testimony and before his cross-examination had begun, counsel for defendants requested the right to examine the transcript. The District Attorney refused to produce the statement to defense counsel because "The statement does not apply to this case. It applies to several other matters." After a lengthy and heated argument between the District Attorney and defense counsel, Holloway was recalled and questioned concerning the relevancy of the tape recording of Wade's statements to this case. He answered that to his knowledge it had nothing in it relating to this case. Thereupon the trial judge ruled, "The Trial Judge at this time will not look at any statements. At the conclusion of the case, in the event that the verdict of the jury would be 'Guilty,' the Trial Judge will look at any statements that are in the possession of the Commonwealth, and if any of those deal with this case, on my own motion I will grant a new trial." Following the verdicts of guilty the trial judge examined the transcript, found it not to relate to the present case, impounded and sealed it for the use of the Appellate Court on appeal. It is now before us subject to our examination.

In considering this argument in the disposition of the motions for a new trial the lower court rejected it solely on its finding that the transcript contained nothing relating to the subject matter then before the court. The trial judge reviewed the transcript and his analysis of it follows:

"I am advised that the statement was actually recorded on a portable tape recorder owned by Mr. Wade, and that included in the tape at the time of the recording were statements and information obtained by Wade

personally and not transcribed by the District Attorney. I understand that the only transcription in the possession of the District Attorney is the statement which was furnished to me.

"I find that the only reference to Mrs. Angeline Martin Wilkerson is on page 20 of the said statement as follows: 'The balance of this tape is probably a conversation I had with Angela Martin, alias Wilkerson, so at the end of the particular recording I have made for you the rest of the tape you can do with as you wish regarding the Wilkerson woman.'

"I am advised that the reference to the above-quoted conversation was recorded personally by Mr. Wade prior to his statement to the District Attorney, along with other personal recordings made by Mr. Wade, and that none of said personal recordings were transcribed by the District Attorney in view of the circumstances; that after transcription of the statement furnished to me was made, the machine and tape were re-used in other matters by the District Attorney's office and later returned to Mr. Wade, the owner.

"I understand that there is no presently existing recording of the said conversations between Mr. Wade and Mrs. Wilkerson.

"My reading of the statement indicates that it deals with a resume of alleged activities within the Police Department of the City of Reading, circumstances under which Mr. Wade supported Mr. Kubacki for election to the office of Mayor, and circumstances under which Mr. Wade became Chief of Police. I can find that it in no way relates specifically to the case wherein Mr. Kubacki is charged with conspiracy and extortion by color of office from Angeline Martin Wilkerson, and in no way relates specifically to the case wherein Mr. Bonanno and Mr. Minker are charged with conspiracy and aiding and abetting extortion by color of office in relation to Mrs. Wilkerson. I can-

not find that the statement of Mr. Wade contradicts the testimony submitted by him at the trial of this case."

The indictments charged the defendants with conspiring to do an unlawful act from "on or about the thirtieth day of June . . . one thousand nine hundred sixty-one, and within three months prior thereto . . . continuously thereafter until the first Monday of January, 1964," and during the same period continuously to have extorted or aided and abetted, "as accomplices and confederates," in extorting money from Angeline Martin Wilkerson.

How closely prior statements must be related to the subject of trial in order to make them available for purposes of cross-examination is a difficult question to resolve, and may depend on the importance of the testimony of the witness which the defense is seeking to impeach. In *Commonwealth v. Smith*, 417 Pa. 321, 208 A. 2d 219 (1965), the words of Mr. Justice O'BRIEN in his dissenting opinion in the first *Smith* case, 412 Pa. 1, 7, 192 A. 2d 671, 674 (1963), were cited with approval: "The rule requiring the turning over of statements touching on the testimony of a witness does not require the laying of a foundation of inconsistency; all that is required is a showing that a report was made, *touching* upon the matter testified to at trial." (Emphasis supplied) See also *United States v. Burr*, 25 Fed. Cas. 187, 191, cited in a footnote of the second *Smith* case, wherein Chief Justice MARSHALL said, "In various modes a paper may bear upon the case, although before the case be opened its particular application cannot be perceived by the judge . . ."

In the present case the convictions of defendants were accomplished largely on the testimony of Wade, whose prior statement is under consideration. Under those circumstances his testimony was under close scrutiny. "Where the jury is in doubt as to whether or

not to believe a witness, the smallest feather of a palpable exaggeration or an inconsistency in a witness's statement on a minor point may be the very item to tip the scales and discredit the witness on his main testimony." *Commonwealth v. Smith*, 417 Pa. 321, 334, 208 A. 2d 219, 226.

Furthermore, in conspiracy cases an express agreement to commit an unlawful act is often difficult to establish and the crime is frequently established by the conduct of the parties which indicate that they were acting in common with a corrupt purpose in view. *Commonwealth v. Albert*, 151 Pa. Superior Ct. 184, 30 A. 2d 184 (1943); *Commonwealth v. Weiner and Zvon*, 148 Pa. Superior Ct. 577, 25 A. 2d 844 (1942), cert. denied, 317 U.S. 631, 63 S. Ct. 56, 87 L. Ed. 2d 509; and consideration is to be given to the background of the arrangements made by the defendants and their methods of association. *Commonwealth v. Cohen*, 203 Pa. Superior Ct. 34, 199 A. 2d 139 (1964), cert. denied, 379 U.S. 902, 85 S. Ct. 191, 13 L. Ed. 2d 176.

Summarizing the evidence, Michael R. DeMarco testified that he and Mayor Kubacki visited Mrs. Wilkerson in the spring of 1961. Mrs. Wilkerson stated she had received a telephone call from Chief Wade in the spring of 1961 informing her that he and the Mayor would visit her. Following this conversation she had a visit from Mayor Kubacki and Detective DeMarco which was followed by another phone call from Chief Wade who informed her she was to pay $75 per week. This call was followed by a visit a few days later by Bonanno who was introduced to her as ". . . the boss from the cash man," and that this was followed by another call from Wade. As a result of all this Mrs. Wilkerson stated that she met Bonanno five or six times at Tenth and Cherry Streets, giving him $75 each time, until she stopped doing business, and that she was not arrested during this period. Wade testi-

fied concerning his association with Kubacki and explained the part he played in the Mayor's election. Subsequently the Mayor discussed with him the matter of Mrs. Wilkerson paying for the privilege of operating the bawdy house in the spring of 1961. He also discussed the matter of Mrs. Wilkerson with the other defendants, Bonanno and Minker. The substance of this latter discussion was that Minker at first objected to the idea of forcing Mrs. Wilkerson to pay money but finally instructed Bonanno to make the collection of $100 (not $75) although he, Minker, would not receive any part of it and said "At least I'll have peace and he won't be threatening to knock off this and knock off that." (Referring to card game, etc., being operated by Bonanno.)

Aside from the direct evidence of contact with Mrs. Wilkerson by Bonanno and on one occasion by Kubacki, the evidence is limited to that which showed the relationship of the parties. To sustain the convictions the jury must have found from that evidence that Mayor Kubacki, Bonanno and Minker were together compelling Mrs. Wilkerson to pay "protection" money in the sum of $75 per week, $50 of which went to Kubacki and $25 to Bonanno, with Minker securing "peace". What this term "peace" meant is somewhat uncertain since it relates inferentially to freedom from coercion in other operations, particularly in gambling operations being conducted by Bonanno. Therefore the establishment of their association was an important feature of the case and therefore, our consideration of the transcript cannot be limited to specific reference to the Wilkerson transaction. If such a basic relationship did not exist there would be no evidence to join the three parties as coconspirators engaged in illegally extracting money from Mrs. Wilkerson. Our review of the impounded transcript indicates clearly that it in a large measure related to that basic relationship, al-

though not specifically related to the Wilkerson matter. We must, therefore, conclude and find that much of the transcript of Wade's prior statement was relevant to the issue before the court and should not have been withheld from inspection by defendants for that reason.

The Commonwealth concedes in its brief that if a prior statement is shown to be relevant to the direct testimony of such witness, it should be available for the purpose of cross-examining that witness without first laying a foundation of inconsistency; however, it insists that the relevancy of the statement if any, can be established only on the testimony of Wade elicited on *cross-examination*. We do not agree and refer to the *direct* testimony of Wade set forth in footnote.[1]

---

[1] Testimony of C. S. Wade (direct) as to conversations between him and Bonanno and Minker:

"A. Well, I started to talk, I started to explain to Abe, Mr. Minker, about Kubacki getting on my back to call Angie Martin up and arrange to take him up there to meet her. I told Abe that he wanted to go up and throw a scare, and he had told me that the rest of the houses are paying off and there is no reason why she shouldn't pay. So Abe said to me, 'Don't you do nothing like that. I warned you before. You are going to get into trouble listening to him.'

. . .

"A. He said [still referring to Minker], 'He has been after me and threatening me about it, too. He threatens to shut the crap game down and knock off the number writers,' and he said, 'You never can tell what he is going to do.' He said, 'I paid that man more money than I ever paid anybody in my life and he still is never satisfied.' He said, 'He spoke to me about her,' and he said, 'He told me she was a friend of yours,' and he said, 'I was going to speak to you about her.' So he turned to Benny and he told Benny, he said, 'You'll have to go up and see her.' He said, 'She can at least pay $100 a week.' I said, 'Abe, that woman cannot pay a hundred dollars a week. She doesn't operate like the other places operate,' and I said, 'She only ever has one girl, never gives anybody any trouble.' So he said, 'Well, she can pay $75 a week anyway.' So Abe said to me, 'You call Angie up and tell her

Although the transcript before us contains much that may not be relevant to the present issue and some of which *may* be considered confidential, the control of such documents is in the hands of trial court which may in its discretion provide adequate safeguards for the protection of the Commonwealth as well as the maker of the statement against unwarranted use of the material therein. *Commonwealth v. Smith,* supra.

We are constrained to conclude that error was committed in two particulars in connection with the transcript of Wade's out-of-court statement. First, it should have been examined by the trial judge before the cross-examination of Wade began. Secondly, the relevant parts of it should have been submitted to counsel for the defendants for inspection and use during the cross-examination of that witness. The denial of that right of inspection and use constitutes reversible error, and compels the granting of a new trial for all defendants.

In view of our conclusion that a new trial is mandatory we shall refrain from passing on the other trial errors relied on by defendants. However, on the record

that Benny is coming up to see her, and tell her that we won't accept less than $75 a week.' So then Benny said to me. 'Don't forget. You call her up and tell her I'll be up. I will get in touch with her. Call her and tell her I am going to call her and then I'll go up and see her.'

. . .

"A. Well, Abe and I was discussing Angie and he said that he never got a nickel from the $75 a week she was paying to Benny Bonanno. He said, '$50 of the money Benny is giving to the Mayor and the other $25 he keeps for his own trouble.' He said, 'I don't get a nickel but at least I'll have peace . . .'

"THE WITNESS: He said, 'At least I'll have peace and he won't be threatening to knock off this and knock off that.' He said, 'I never wanted anything anyway. He can have it all.' He said, 'Then he is not going after Benny all the time and threatening to shut down Benny's card game because he gets the fifty and Benny gets the twenty-five.' He said, 'I'm glad everything is quiet now.' "

540

before us, we express the opinion that it was not error to refuse the motions in arrest of judgment.

Judgments reversed and new trials are ordered as to all defendants.

ERVIN, P. J., and WRIGHT, J., would affirm upon the opinion of President Judge HESS for the court below.

HOFFMAN, J., took no part in the consideration or decision of this case.